UNITED STATES of America, Plaintiff-Appellee,

v.

Henry Stuart BROWN, Defendant-Appellant.

No. 468, Docket 74–1947.

United States Court of Appeals, Second Circuit.

Argued Jan. 8, 1975.

Decided Feb. 20, 1975.

---

Robert L. Clarey, Asst. U. S. Atty., Brooklyn, N. Y. (David G. Trager, U. S. Atty., for the Eastern District of New York, and Paul B. Bergman, Asst. U. S. Atty., Brooklyn, N. Y., on the brief), for plaintiff-appellee.

Frederick H. Cohn, New York City, for defendant-appellant.

Before MEDINA, FEINBERG and MANSFIELD, Circuit Judges.

MEDINA, Circuit Judge:

Henry Stuart Brown appeals from a judgment of conviction of armed bank robbery in violation of 18 U.S.C., Section 2113(d) and Section 2, after a trial to Chief Judge Mishler and a jury. He was sentenced to 20 years in prison, to run consecutively to a term of 25 years that he was serving in the State of Missouri at the time of the trial. The Missouri sentence was imposed on September 29, 1973 on a plea of guilty made on July 24, 1972 to charges on three counts of assault with intent to kill. We find no merit in any of the points made for reversal and we affirm.

The preparations for the robbery followed the usual routine. Four or five of the prospective participants met in various apartments and discussed the matter. Brown said he liked the looks of the Bankers Trust Company on the corner of DeKalb Avenue in Brooklyn, partly because it had only one surveillance

camera. Further inspection by the group confirmed Brown's appraisal, especially as they noticed the windows of the bank were so high that persons on the street could not see what was going on inside of the bank. When Brown, Roland, Green and Kearney met on Sunday evening, January 9, 1972, to arrange the details of the operation, Jackson, whose car they had used when casing the bank, was not there. So Green and Roland set out on foot to steal a suitable car. At about 11 P.M. they came across a car rental agency somewhere on Church Avenue in Brooklyn. Pistols in hand they forced the attendants to give them the keys to a small foreign rental car, of unknown make and registration, that was parked across the street. They drove away in this car and parked it about a block from the bank. The next morning, January 10, Brown, Kearney and Green stood together on the sidewalk just across the street from the bank, and, when they saw Roland coming in the stolen car that was to be used as a getaway, they entered the bank and the robbery took place. Each man had a loaded hand gun and, on the way to the bank, a paper shopping bag had been purchased to hold the currency they expected to steal.

According to their plan either Green or Kearney said: "O.K. this is a hold-up, everybody on the floor." As Brown tried to open a locked door adjacent to the teller's area, he left prints from three of the fingers of his left hand. A surveillance camera that Brown had not noticed took the most perfect photographs of the operation that we have ever seen. There are several very clear photographs of Brown with the shopping bag. There is a glove on his right hand but his left hand is bare. Although Kearney and Green, guns in hand, appear to be wearing masks, Brown's face is uncovered, except for a pair of dark glasses, and unlikely as it might seem, the manager and assistant manager of the bank, who conversed briefly with Brown, were unable to identify him. The assistant manager after looking at a spread of photographs for 15 minutes, picked out the wrong one. We were told on the oral argument that Brown's appearance had not changed. At the trial he wore no beard nor had he submitted to any face lifting operation. We have come across similar failures to identify armed bank robbers in the past and the possibility that this may be due to fear cannot be ruled out. In any event, on this record and with these photographs we think the proof of Brown's guilt is overwhelming. Incidentally, after he had climbed over the counter with the help of a chair, he scooped up the money in the drawers of the various tellers and put it in the shopping bag, and he left his loaded revolver on the shelf in the teller's cage. Roland was given immunity and testified for the prosecution. We shall hear more of him.

*I*

*The Pre-indictment Delay*

The armed bank robbery occurred January 10, 1972. Brown received about $3700 the same day as his share of the contents of the shopping bag. The next we hear of him is in Missouri on July 27, 1972 when he pleaded guilty to 3 counts charging him with assault with intent to kill. On June 5, 1972 positive fingerprint identification of Brown was made. The indictment against Brown was filed on November 1, 1973, some seventeen months after the fingerprint identification.

■ Chief Judge Mishler denied a motion for a hearing to compel the prosecution to explain the reasons for this delay as a preliminary to a possible further motion to dismiss the indictment. The mere lapse of time between the fingerprint identification on June 5, 1972 and the filing of the indictment on November 1, 1973 constitutes no proof that Brown was prejudiced by the delay nor does it in the slightest degree indicate any foul play by the prosecution designed to deprive Brown of a fair trial or to affect his rights in any manner.

There is a surprising amount of discussion in numerous opinions of various

Courts of Appeals in the federal judicial system relating to what might some day be proved or even plausibly alleged by a defendant in a criminal case to justify the dismissal of an indictment for prosecutorial misconduct in failing promptly to seek an indictment. That there must be some such showing is the mandate of United States v. Marion, 404 U.S. 307, 325, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). Here the record is completely bare as to prejudice to the appellant and as to prosecutorial misconduct. The motion for a hearing was properly denied. We do not think that what was said in United States v. Ferrara, 458 F.2d 868 (2d Cir.) cert. denied, 408 U.S. 931, 92 S.Ct. 2498, 33 L.Ed.2d 343 (1972), was intended in any way to change the rule as formulated in *Marion.*

## II

### *The Black Liberation Army*

From the very beginning of the trial counsel for Brown tried in every possible way to bring the Black Liberation Army terrorist group into the case. One would suppose that it was in the interest of Brown to keep the Black Liberation Army out of the case, but his counsel thought otherwise. The specific issue on appeal involves the refusal of the trial judge, on grounds of irrelevance and possible prejudice, to allow Brown's trial counsel to cross-examine Roland on Brown's connections with the Black Liberation Army and Roland's negotiations with the Kings County District Attorney about information on the Black Liberation Army.

It was clear from the lengthy reported dialogue between the Kings County prosecutor and Roland submitted as *Jencks*[1] material to the defense, on which Brown places such reliance, that Roland knew practically nothing about the Black Liberation Army and less about Brown's connection with the Black Liberation Army, if any. Brown's membership and participation in that organization had at best extremely slight relevancy to the bank robbery charges being tried.

One look at the surveillance photographs showing dozens of persons face down on the floor covered by three robbers brandishing their revolvers can give some idea of the reactions of the ordinary citizen to what one reads in the newspapers every day of murders, robberies and the shooting and bombing of innocent bystanders. Whether so intended or not, it is clear to us that the connection with the Black Liberation Army, if any, of Brown or the prosecution witness Roland was so tenuous as to give little support to the theory that extensive questioning of the jurors on the *voir dire* and prolonged cross-examination of Roland on the subject of the Black Liberation Army would disclose some bias by the police or by other enforcement agents against the Black Liberation Army that would rub off on Brown and prejudice him. What such inquiries might well have done, on the other hand, was to give prospective witnesses the notion that it would be better for their health if they did not testify against Brown, and to give jurors the notion that a verdict of guilty might have unfortunate consequences.

■ In the exercise of his discretion Chief Judge Mishler properly refused to permit any discussion of or any question concerning or even any mention of the Black Liberation Army in the presence of the jury. Under the circumstances this was precisely the correct ruling to make on the subject.

By way of contrast, however, Chief Judge Mishler permitted an exhaustive cross-examination of Roland to bring out that his testimony against Brown was given under a promise of immunity and to prove a life of crime and violence quite sufficient to impeach him, had the jury not been furnished with what appears to us to be ample corroboration of Roland's testimony. Brown did not testify and he rested his defense at the close of the prosecution's case.

1. 18 U.S.C., Section 3500.

## III

### The Testimony of Frederick E. Webb

For over 20 years Mr. Webb has been a Special Agent of the FBI assigned to the FBI Laboratory in Washington. He is Chief of the Special Photographic Unit and has made extensive studies and experiments. The large and increasing number of bank robberies and the almost universal use of surveillance cameras greatly expanded Mr. Webb's activities in his interesting specialty, which is comparing surveillance bank robbery photographs with known photographs of persons sought to be identified. He has done this work in several hundred cases and has given expert testimony with respect to this kind of evidence in about 30 federal court proceedings. Chief Judge Mishler found that the proof of his qualifications was sufficient to make his testimony admissible, leaving to the jury the question of whether they considered him an expert in his field and also leaving to the jury to decide the weight to be given to his testimony. Counsel for Brown objected and claimed that Mr. Webb's testimony was not a proper subject for testimony as an expert and that it usurped the function of the jury who could see Brown present in the courtroom and could make their own evaluation of the surveillance photographs without any assistance from Mr. Webb.

We have no doubt that Mr. Webb qualified as an expert in the field because of his many years of study and experimentation. The question before us is whether it was proper to permit him to express his opinion on the specific phases of the process of identification to which the prosecutor addressed himself. We think the questions were proper. At no time did Mr. Webb state that Brown was the man photographed in the bank. This was in contrast to the fingerprint testimony which directly and unequivocally was to the effect that the prints found on the door leading to the teller's cage were those of Brown and not those of any other person.

The method of taking the new photographs of Brown to establish a proper basis of comparison was described, also the manner of blowing up all the photographs to give the same effect as that produced by a microscope. Then Mr. Webb did what the prosecutor described as teaching "you (the jury) and me and everybody here, how to look at a photograph." We have no doubt that this was proper expert testimony and that the jury might have found it helpful. This was especially true of what Mr. Webb stated on the subject of the lobes of the ears. He described the ear lobes of a person and the configuration of the ear as coming closest "to being like a fingerprint." Mr. Webb's conclusion was "that these photographs were all consistent and that these are either photographs of the same person or a person of the same features."

Another phase of Mr. Webb's testimony we think was also clearly proper expert proof. By making careful measurements and placing Brown in a position as nearly as possible identical with his location in the bank according to the surveillance photographs that were taken, Mr. Webb with both sets of photographs made some mathematical calculations set forth in a diagram and testified that the height of the man robbing the bank and the height of Brown were about the same.

■ In the realm of identification by photographs and expert testimony no two cases are alike. We hold that there was no error in this case in the admission of Mr. Webb's testimony and the use that was made of it. See United States v. Fernandez, 480 F.2d 726, 735 (2d Cir. 1973).

## IV

### The So-called Presumption for Failure to Call Witnesses

At times, especially in criminal cases, an utterly insignificant colloquy is blown up to make it look like a legitimate point for reversal. It will be recalled that the night before the bank robbery Roland and Green stole a car from a car rental agency somewhere on Church Avenue in

Brooklyn, after holding up the two employees at gun point. He also testified that he used this car in the robbery and then abandoned it. Roland could not remember the precise location of the place where he abandoned this car nor could he remember whether he left the keys in the car. There is nothing else in this record about the getaway car. There is nothing to show that the employees of the rental car agency were ever identified, nor is there anything to show that the loss was reported to the police or that the car was ever taken into custody by the police. If Roland left the keys in the car, it is probable that it was again stolen a few minutes after being abandoned by Roland, as suggested in the Government's brief.

During his summation counsel for Brown was discussing the failure of the prosecution to sustain its burden of proving Brown's guilt beyond a reasonable doubt. As he was leaving the subject of the fingerprints, counsel veered off and began to speculate on "what the Government did have or did not have to support an indictment." This remark was stricken. But within a few seconds counsel was back at it again. This time he began commenting on the failure of the prosecution to produce proof about the getaway car, saying "You may infer from that that * * * had it been brought forward (it) would not have been favorable to the Government's case." Chief Judge Mishler said he did not agree with this and he pointed out the distinction between arguments addressed to the legal effect of a failure to produce evidence and those addressed to an alleged failure on the part of the Government to establish its burden of proving guilt beyond a reasonable doubt. There the matter rested until Chief Judge Mishler gave his instructions to the jury. There was no objection, and no motion of any kind.

What he said later was:

A reasonable doubt may arise from the failure of the Government to produce proof, and that the defendant is not obliged to produce any proof, doesn't have to subpoena witnesses. However, Mr. Cohn said that you may infer from the failure of the Government to produce those two witnesses that if they were produced they will give testimony that would weaken the Government's case or contradict Mr. Roland. That's where I differ with Mr. Cohn. You should be advised that even though the defendant need not produce proof, he still has the power to subpoena anyone he wants to and where we find, and where witnesses are controlled by neither party, or putting it affirmatively, are under the equal control of the parties, you may not draw an adverse inference from the Government's failure to produce the witnesses.

■ We are told that the giving of the above-quoted instructions was a clear violation of Brown's constitutional privilege against self-incrimination because of the reference to Brown's subpoena powers. This is pure humbug. Chief Judge Mishler explicitly and repeatedly instructed that the jury was to draw "no unfavorable inference of any kind * * in the failure of the defendant to testify" and that the jury "may not draw any unfavorable inference from the defendant's failure to offer any proof." Brown's privilege to remain silent and to rest upon the prosecution's burden of proof was in no way infringed.

■ Claim is also made by Brown that it was reversible error for the trial judge to instruct that if a witness is "under equal control" of the parties no adverse inference could be drawn from the failure of the Government to produce the witness. If there was an equally available witness this charge might well be error. Here, however, evidence as to the stolen car was equally unavailable to both sides, making an adverse inference against either side impermissible. United States v. Super, 492 F.2d 319, 323 (2d Cir. 1974). Accordingly, there was no error in the instruction that the jury "may not draw an adverse inference from the Government's failure to pro-

duce the witnesses." The reference to the service of subpoenas was harmless surplusage.

Affirmed.