**UNITED STATES of America,
Appellee,**

**v.**

**Howard FINKELSTEIN, a/k/a Robert Howard, et al., Appellants.**

**Nos. 162, 163, 182 and 253, Dockets 75–1154, 75–1155, 75–1170 and 75–1171.**

United States Court of Appeals, Second Circuit.

Argued Sept. 17, 1975.

Decided Dec. 1, 1975.

Certiorari Denied May 3, 1976. See 96 S.Ct. 1742.

Irving L. Weinberger, New York City (Frederick Newman, New York City, of counsel), for appellant Finkelstein.

Eleanor Jackson Piel, New York City, for appellant Scardino.

John H. Doyle, III, New York City (Anderson, Russell, Kill & Olick, P. C., Scott B. Lunin, Robert P. Reichman, New York City, of counsel), for appellant Segal.

Stanley I. Greenberg, Los Angeles, Cal. (Kirschner & Greenberg, Richard H. Kirschner, Los Angeles, Cal., of counsel), for appellant Zuber.

John S. Siffert, New York City (Paul J. Curran, U. S. Atty., S. D. N. Y., John D. Gordan, III, Asst. U. S. Atty., of counsel), for appellee.

Before MOORE, FEINBERG and OAKES, Circuit Judges.

MOORE, Circuit Judge:

Viewed, as it must be, in a light most favorable to the government, the evidence introduced below established that from early 1969 until the spring of 1970 Alan Segal ("Segal"), Anthony Scardino ("Scardino"), Burney Acton ("Acton"), Michael Clegg ("Clegg") and others devised and executed a fraudulent scheme to amass and distribute to unsuspecting buyers thousands of shares of worthless stock of Pioneer Development Corporation ("Pioneer"), swindling them out of

over three hundred thousand dollars in the process. To facilitate examination of the various alleged errors raised by appellants on appeal the salient aspects of their cabal are set forth as follows.

In early 1969 Acton and Clegg became interested in obtaining control of the outstanding shares of Pioneer, a dormant shell corporation whose stock was originally issued prior to the passage of the 1933 Securities Act. By July 31, 1969, they had accumulated enough shares to control Pioneer.

During the spring and summer of 1969, Acton and Clegg met and talked with Scardino at his recently acquired Riverside Hotel in Reno, Nevada. They explained their interest in initiating trading in the Pioneer stock which they were in the process of acquiring. Scardino told them that Alan Segal, a partner in the Riverside Hotel and a New York promoter, was very adept at stock trading and suggested that Clegg contact Segal. Shortly afterwards, Scardino arranged a meeting in Dallas. Scardino, Acton, Clegg and Segal were present. Clegg explained to Segal that Acton and he controlled the majority of outstanding Pioneer stock and presented Segal with documentary material about Pioneer, Lone Tree Mining, and Precise Power, the latter two being companies which Pioneer had options to purchase. Segal took some of the stock and agreed that he would provide them with $500,000 in operating capital by trading it in New York. He stated that he would determine the price at which it would open and support the stock to make sure it did not decline in value. He also stipulated that the stock remaining with Acton and Clegg in the West was not to be sold on the open market. After the Dallas meeting, Acton, Scardino, Segal and others met at the Riverside Hotel in Reno and discussed their scheme further.

In late September or early October, Segal, Acton, Clegg, Schiffman (Segal's attorney), and others met in Los Angeles. Segal repeated his promises and assurances, reminding his co-conspirators that he had to "keep the shoe box" to be able to keep the price of the stock where he wanted it. Another meeting took place on October 23, 1969 at the Riverside Hotel, at which Segal received over 50,000 Pioneer shares to take to New York and begin trading.

By October 30, 1969, Segal had commenced trading in Pioneer stock in New York at Karen & Co. through Joseph Azzerone, a broker, using a nominee, Francine Zahl, who was Segal's secretary. He arbitrarily selected $5.00 as the stock's opening price, and by means of directed trades, touting, misrepresentations, and a host of other incriminating misdeeds, he manipulated the price of the stock upward until it reached $9.00 per share. To sustain market activity in the stock he guaranteed purchases which he arranged to be made by personal friends. He also used nominees to procure loans by pledging Pioneer stock as collateral.

When, in early November, the $500,000 that Segal had promised to send to Acton and Clegg had not been received, Acton turned to Scardino for assistance. He informed Scardino that he needed money and that although he had promised Segal that he would not sell the stock, Segal would allow him to use it as collateral for a loan. Scardino agreed to secure a loan by pledging Pioneer stock which Acton would issue to him. However, upon receiving the stock Scardino and his employee, McKibbon, sold it. Part of the proceeds were given to Acton; Scardino and McKibbon split the rest. Not realizing the shares were being sold, Acton subsequently asked Scardino to arrange another "loan", using additional shares. Either Scardino or McKibbon sold these shares as well.

When these shares began to reach the eastern market, Segal reacted quickly. He contacted an associate, Gardner, told him the people he was working with in the West were robbing him, and asked him if he knew anyone who could resolve his problem. Gardner suggested Howard Finkelstein ("Finkelstein") and arranged for him to meet Segal. At the meeting Segal informed Finkelstein of the situa-

tion, and Finkelstein agreed to act as Segal's enforcer.

Finkelstein went West to investigate the "backdooring", bringing along Anthony Zuber ("Zuber") who, according to at least some of the testimony, carried a gun with him. Zuber confronted Clegg and demanded to know who had been selling Pioneer in the West. Clegg denied having sold any stock and telephoned Segal to tell him as much. Clegg then handed the phone to Zuber who conversed with Segal. Shortly thereafter, Zuber forced Acton to enter a car and accompany him and Finkelstein to the Holiday Inn in Reno. By way of explanation, he informed Acton that "we got to get the stock situation straightened out". Upon arriving at the motel, Zuber, Finkelstein, and Acton met with Scardino and McKibbon. Scardino professed amazement when he was probed about the western sales. McKibbon also denied knowing anything about them, but under physical coercion confessed to having made the sales and agreed to repay Segal. Thereupon, Scardino also promised to give Segal the proceeds which he had received from the western sales.

Upon returning to New York, Finkelstein and Zuber evidenced interest in profiting personally from the fraudulent scheme. Finkelstein asked Gardner if he knew a furrier who would be willing to deal in stock rather than cash. Gardner suggested Allen Grant and arranged for them to meet Grant at his shop, which they did the same day. Zuber offered to exchange Pioneer stock for coats but stipulated that he would not make any deal unless Grant gave him a 60-day repurchase option at $10 a share. Zuber proceeded to make various misrepresentations about the stock. Grant agreed to exchange seven fur coats valued at $15,-000 for $42,000 of Pioneer stock, and Zuber and Grant executed the. option, which Finkelstein initialled. It was understood that as part of the arrangement Finkelstein was to receive "something", although there is no evidence of what, if anything, was his ultimate reward.

Throughout the duration of this conspiracy, Pioneer remained an empty shell. It possessed options to purchase a Nevada mercury mine and a company called Precise Power, and on October 29, 1969, Acton and Clegg exercised the Precise Power option and acquired that company in exchange for 600,000 shares of restricted Pioneer stock. However, Precise Power's assets were worth less than $5,000 and it never produced any revenues. Pioneer also acquired the Nevada mercury mine on December 3, 1969, several weeks after trading in Pioneer stock had begun, but it never produced any revenues either.

## PREJUDICIAL VARIANCE

■ Having sketched the background, we may now delineate appellants' contentions. We first consider the claim of appellants Scardino and Segal that the government's proof demonstrated the existence of multiple conspiracies. They interpret the indictment narrowly and assert that it does not encompass the western sales made by Scardino and McKibbon in violation of Segal's instructions. They argue that the western sales constitute a separate conspiracy because those sales threatened to undermine Segal's control over the market for Pioneer stock by bloating its supply and depressing its price. Proceeding from the premise of separate conspiracies, they maintain that the evidence concerning the western sales should not have been received and that its reception constituted a prejudicial variance substantially affecting the appellants' rights. We do not agree.

While the western sales may have had the potential to undermine Segal's New York operations, both groups of stock sales manifested a unifying purpose—namely bilking the unsuspecting public by foisting worthless stock upon it. The consummation of each particular fraudulent transaction, whether it be in New York or the West, was dependent upon the successful exploitation of the illusion of legitimate market activity—an illusion to which each transaction contribut-

ed its share. That certain defendants were eager to cheat each other for a large slice of the spoils does not obscure the unifying means used by all of them to defraud the public in the first place. *See, United States v. Torres*, 519 F.2d 723 (2d Cir. 1975); *United States v. Salazar*, 485 F.2d 1272, 1276–77 (2d Cir.), *cert. denied*, 415 U.S. 985, 94 S.Ct. 1579, 39 L.Ed.2d 882 (1974).

## "ALL–OR–NOTHING" CHARGE

■ The question whether there are one or more conspiracies is primarily for the jury, since it is a question of fact as to the nature of the agreement. *Torres, supra*, citing with approval *United States v. Crosby*, 294 F.2d 928, 945 (2d Cir. 1961), *cert. denied*, 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523 (1962). Judge MacMahon's instructions properly submitted that question to the jury in this case.

■ Appellant Scardino argues that, on the contrary, the judge's instructions constitute the type of "all-or-nothing" charge condemned in *United States v. Kelly*, 349 F.2d 720 (2d Cir.), *cert. denied*, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966); and *United States v. Borelli*, 336 F.2d 376, 386 n. 4 (2d Cir. 1964), *cert. denied*, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). To support his contention, he relies on a fragment of the entire charge, which, if viewed in isolation, arguably supports his position. However, viewed in its entirety, the charge adequately stressed the need to consider the guilt or innocence of each defendant individually. *See United States v. Cohen*, 518 F.2d 727 at 734–35 (2d Cir. 1975).

The jury considered the facts in light of the judge's instructions and determined that appellants Segal, Scardino, and other unindicted co-conspirators, participated in a single conspiracy. Even the most cursory review of the proof adduced below amply supports their determination, and while the evidence implicating Scardino may appear less damning when compared with Segal's machinations, it satisfies the applicable standard for reviewing the sufficiency of the evidence of a party's participation in a conspiracy. Scardino led Acton and Clegg to Segal and sat at their side as the conspiracy was spawned. He had numerous conversations with Acton about Pioneer and its stock, and he, himself, greedily exploited the arrangement by engineering sales transactions in the West.

## PINKERTON SPILLOVER

■ Appellants Scardino and Segal assert a related argument that Judge MacMahon's "Pinkerton" charge infected their convictions of the substantive counts. This argument is also meritless. Aside from the abundant evidence of Scardino's participation in the conspiracy, the substantive crimes for which he was convicted related only to Pioneer transactions in which he was directly involved. Thus, even assuming *arguendo* that the Pinkerton charge was inappropriate, we do not perceive how Scardino suffered any prejudice. This is not to say that a Pinkerton charge was inappropriate. The rationale first enunciated in *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), retains vitality today.[1] *United States v. Aloi*, 511 F.2d 585, 600 (2d Cir. 1975). Given the evidence of a single conspiracy and Segal's and Scardino's participation in it, application of the "Pinkerton"

---

1. The "Pinkerton" charge derives its name from *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), in which the Court explained its rationale and approved its use in cases where there is sufficient evidence of a defendant's participation in a conspiracy before or at the time a substantive crime is committed by another party to the conspiracy in furtherance of the conspiracy.

The charge instructs the jury that the defendant may be convicted of the substantive offense even though he was not directly involved in its commission, the rationale being that since a conspiracy is nothing but a "partnership in crime", the responsibility for acts of one partner in furtherance of partnership business are imputed to all.

charge in this case was not error. Scardino's argument that the substantive offenses charged were not reasonably foreseeable as a natural consequence of the unlawful agreement is frivolous.

## FAILURE TO SEVER

■ Appellants Scardino and Zuber argue that the trial court's denial of their repeated severance motions was reversible error. Appellant Scardino claims that his case should have been severed to permit him to take advantage of exculpatory testimony which might have been given by defendants Segal and Zuber, who allegedly did not intend to testify at a joint trial.[2] Appellant Zuber relies on an affidavit submitted by appellant Finkelstein which stated that he would not testify at a joint trial but that he intended to testify on behalf of Zuber if Zuber's case were severed. Zuber also relies on an affidavit by his counsel which was submitted at a hearing of his severance motion. His counsel represented that there was a "strong likelihood" that Segal would testify on behalf of Zuber if severance were granted and that Segal's counsel had informed him that Segal "would provide exculpatory testimony". During the hearing counsel explained that the anticipated Segal exculpation consisted of a denial that he had talked with Zuber prior to January 10, 1970, that he ever had a telephone conversation with Zuber or Clegg at Clegg's home prior to the Reno meeting at the Holiday Inn, and that Scardino was ever present at any meetings where Pioneer was discussed. The anticipated Zuber exculpation of Scardino purportedly was that Scardino had no knowledge of the western sales and that McKibbon, not Scardino, arranged those transactions. Finally, Finkelstein purportedly would have testified that there was never a discussion in his presence informing Zuber of the fraudulent activities and that Zuber always acted as if he believed with good faith in Pioneer's mining prospects.

For purposes of discussion, we will assume that appellants Scardino and Zuber intended to have a co-defendant testify, that the expected testimony might have been exculpatory and that the testimony, if believed, might have supported Zuber's defense of good faith and undermined the government's proof that Scardino knowingly and wilfully participated in the conspiracy. However, these factors merely define the perimeters of the severance question—the crucial inquiry remains whether the appellants were so prejudiced by a joint trial under these circumstances that severance should have been granted.

■ In reviewing this issue, we confine ourselves to the question of whether the trial judge's denial of the severance motions was an abuse of discretion. *Opper v. United States*, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954); *U. S. v. Turcotte*, 515 F.2d 145, 150 (2d Cir. 1975). Other circuits which have considered similar severance claims have enunciated criteria which assist us in this examination. Without purporting to delimit the trial court's field of inquiry, we observe that it properly could have considered: (1) the sufficiency of the showing that the co-defendant would testify at a severed trial and waive his Fifth Amendment privilege, *United States v. Kahn*, 381 F.2d 824, 841 (7th Cir.), *cert. denied*, 389 U.S. 1015, 88 S.Ct. 591, 19 L.Ed.2d 661 (1967); *Gorin v. United States*, 313 F.2d 641, 646 (1st Cir.), *cert.*

---

2. Appellant Scardino also claims that his severance motion should have been granted to avoid prejudicial "spillover" relying on *United States v. Kelly*, 349 F.2d 720 (2d Cir.), *cert. denied*, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966). In view of our disposition of the prejudicial variance and *Pinkerton* arguments, this independent ground is not persuasive. *Cohen, supra*, at 735–36; *U. S. v. Sperling*, 506

F.2d 1323, at 1342 (2d Cir.), *cert. denied*, 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975). His tangential argument that the trial judge committed plain error when he did not marshal the evidence differentiating Scardino from the other co-conspirators is frivolous. *United States v. Nuccio*, 373 F.2d 168 (2d Cir.), *cert. denied*, 387 U.S. 906, 87 S.Ct. 1688, 18 L.Ed.2d 623 (1967).

denied, 374 U.S. 829, 83 S.Ct. 1870, 10 L.Ed.2d 1052 (1963); *cf. United States v. Sanchez*, 459 F.2d 100, 102 (2d Cir.), *cert. denied*, 409 U.S. 864, 93 S.Ct. 156, 34 L.Ed.2d 112 (1972); (2) the degree to which the exculpatory testimony would be cumulative, *Byrd v. Wainwright*, 428 F.2d 1017, 1021 (5th Cir. 1970); (3) the counter arguments of judicial economy, *United States v. Shuford*, 454 F.2d 772, at 777 n. 5, (4th Cir. 1971); and (4) the likelihood that the testimony would be subject to substantial, damaging impeachment, *Wainwright, supra.*

At the outset, the government makes much of the fact that separate trials would have resulted in a substantial duplication of proof and concludes that the concomitant judicial economy inherent in a joint trial outweighed the appellants' interest in severance. While we are not unmindful of the necessity to husband scarce and overburdened judicial resources, we also must acknowledge that duplication of proof is often inevitable in situations meriting separate trials. The counter-argument of judicial economy is, indeed, a serious consideration, but by itself does not foreclose further inquiry.

More telling is the government's assertion that much of the expected testimony would have been cumulative. During cross-examination of the government's prime witnesses, Acton and Clegg, testimony was elicited that Scardino was surprised about the western sales, that Scardino had no knowledge of McKibbon's consummating those transactions, and that Scardino was never present at any meetings where a fraudulent scheme was mentioned. While the repetition of such testimony might have increased the likelihood that it would be believed, the fact remains that the expected testimony as to Scardino would have been almost entirely cumulative. To some extent, the anticipated testimony on behalf of Zuber would have been cumulative as well. Gardner testified that Segal's first meeting with Zuber was either in late December or early January; Acton and Clegg testified that Zuber believed Pio-

neer was a viable company and denied ever discussing with him the fraudulent scheme outlined in the indictment.

The government also argues that there was an insufficient showing that any of the co-defendants would testify. It points to the affidavit of Zuber's counsel which states in conclusory terms that there was a "strong likelihood" that Segal would testify on behalf of Zuber. Appellants respond that affidavits by counsel suffice to demonstrate a reasonable probability of testimony, and that, in any event, they are unnecessary. *Wainwright, supra*, 428 F.2d at p. 1020. A close inspection of *Wainwright* indicates that appellants' reliance is misplaced. That case held that affidavits were not necessary to show that one co-defendant *desired to call* another at a separate trial, it did not discuss the necessity of affidavits to show that, if called, the co-defendant *would* testify. But in the view we take of the case, it is not necessary to resolve this controversy.

Even assuming that affidavits of counsel for the co-defendant who would be called to testify at a separate trial are unnecessary, a sufficient showing has not been made that any of the co-defendants would have waived their Fifth Amendment privilege if severance had been granted. Given the fact that none of the co-defendants pleaded guilty or evidenced any intention of doing so, it is unrealistic to think that a co-defendant "would be any more willing to waive his constitutional privilege against self-incrimination when called as a witness at a separate trial than he would be willing to insist upon his privilege as a defendant not to take the stand." *Gorin, supra*, 313 F.2d at 646. Had Finkelstein testified, for example, his testimony would have been subject to substantial damaging impeachment by grand jury minutes which would have revealed Finkelstein's knowledge of Segal's manipulative designs, and hence tended to incriminate him.

Appellants rely on *United States v. Echeles*, 352 F.2d 892, at 898 (7th Cir. 1965), and *Wainwright, supra,* 428 F.2d

at p. 1021, to support their argument that a trial court could obviate the privilege problem by ordering the sequence of several trials so that when a co-defendant was called to testify, an adjudication of his guilt or innocence would already have occurred in a prior trial. However, the import of those decisions cannot be adequately gauged without reference to their respective factual contexts. In *Echeles*, it was unlikely that the Fifth Amendment privilege would have been invoked because the proposed codefendant witness had previously exculpated the appellant three times in open court. *Echeles, supra*, 352 F.2d at p. 898. In *Wainwright*, only one defendant had a unique interest in being tried later than the others and there was a strong likelihood that at least some of the co-defendants would plead guilty. *Wainwright, supra*, 428 F.2d at p. 1022. In the instant case there was no indication that anyone intended to plead guilty, and, consequently, privilege complications would have been eliminated only if there had been *four* separate trials with Segal's having been first, followed by Finkelstein's, Zuber's and Scardino's.

We are not callous to the problem of protecting the rights of individual defendants in conspiracy trials, but in light of the necessary duplication of proof, the cumulative nature of the expected testimony, the damaging impeachment' to which it would have been subject at separate trials, and the probability that one or more co-defendants would have invoked their Fifth Amendment privilege, we do not believe that appellants have overcome the difficult burden of demonstrating sufficient prejudice to have warranted severance. Having considered appellants' arguments and weighed the pertinent factors in light of the circumstances of this case, we cannot say that the trial judge abused his discretion in denying their severance motions. *United States v. Lebron*, 222 F.2d 531, 535 (2d Cir.), *cert. denied*, 350 U.S. 876, 76 S.Ct. 121, 100 L.Ed. 774 (1955).

## PRE–INDICTMENT DELAY

Appellants Segal, Scardino and Zuber all claim that the indictment should be dismissed because it was filed more than four and one-half years after the last overt act was committed in furtherance of the conspiracy.[3] Each asserts resulting undue prejudice. They rely heavily on *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), interpreting language in that case as mandating dismissal of an indictment when either actual prejudice *or* intentional prosecutorial delay to obtain some tactical advantage is adequately demonstrated. The government, on the other hand, contends that the *Marion* language must be read conjunctively and that, in any event, there was justifiable cause for the delay and no actual prejudice. *United States v. Frank*, 520 F.2d 1287 at 1292 (2d Cir. 1975), slip op. at 4446; *United States v. Brown*, 511 F.2d 920, 923 (2d Cir. 1975).

The difficulty with the government's position is that in both *Brown* and *Frank*, there was neither actual prejudice nor intentional delay. Thus, those cases do not assist us in our interpretation of *Marion* since the result in both cases would be the same regardless of which interpretation of *Marion* was adopted.[4]

---

**3.** Appellant Zuber also argues that dismissal of the indictment was mandated pursuant to Rule 48(b) F.R.Crim.P. and that his speedy trial right under the Sixth Amendment was violated. However, neither the Sixth Amendment nor F.R.Crim.P. 48(b) applies to the instant situation where delay has occurred after the commission of the crime but before the filing of the indictment. *United States v. Marion*, 404 U.S. 307, 312 n. 4, 313, 319, 92 S.Ct. 455, 459 n. 4, 462–63, 30 L.Ed.2d 468, 474, 478 (1971).

**4.** *See also, United States v. Ferrara*, 458 F.2d 868 (2d Cir.), *cert. denied*, 408 U.S. 931, 92 S.Ct. 2498, 33 L.Ed.2d 343 (1972) (cited in *Brown, supra* ); and *United States v. Iannelli*, 461 F.2d 483, at 485 n. 2 (2d Cir.), *cert. denied*, 409 U.S. 980, 93 S.Ct. 310, 34 L.Ed.2d 243 (1972) where neither factor was established.

However, on the facts before us it is not necessary to resolve the question. Segal claims prejudice resulting from the loss of a "due diligence" file which purportedly contained documentary material, information about Precision Power, and reports on Lone Tree Mining. Apparently, he believes that this material would have established his "good faith" dealing in Pioneer. But there is no evidence that Segal even saw this file or that anyone advised him of its contents. Schiffman testified that he received the file after he had advised Segal that Pioneer lacked substantial assets but conceded that he really did not read it (Tr. 292). Zuber also relies on the missing "due diligence" file as evidence of actual prejudice, but as in Segal's case there is no evidence that Zuber ever saw or heard of it.

■ Segal and Zuber also claim that the witnesses' hazy recollection impaired their defense. This, however, is not the kind of "actual" prejudice required by *Marion*. *United States v. Foddrell*, 523 F.2d 86 at 87 (2d Cir. 1975). We have considered appellants' remaining claims of prejudice and find them to be without merit.

There being no showing of "actual prejudice", nor any showing that the government intentionally delayed filing of the indictments to gain some tactical advantage, appellants' pre-indictment delay argument must fail. Even assuming *arguendo* that "actual prejudice" was established, dismissal of the indictment would be unwarranted in light of the government's justification for the delay. In large part the delay can be attributed to the careful investigation of the case by the Securities and Exchange Commission and the Department of Justice. The investigation by attorneys of the latter agency after reference of the case to it by the S.E.C. led to the inclusion of individuals in the indictment who had not been named in the S.E.C.'s civil action and the exclusion of another who had been. The deliberate pace of the investigation redounded to society's benefit in two ways: it protected an innocent party and ferreted out two who were culpable.

## APPELLANT FINKELSTEIN'S CHALLENGES TO HIS CONVICTION OF COUNTS 29 AND 44

*Count 29:*

■ Finkelstein was convicted of exchanging 6900 Pioneer shares for seven fur coats in violation of 18 U.S.C. § 2 and 15 U.S.C. § 77q. On appeal he challenges the sufficiency of the evidence implicating him as an aider and abettor in the transaction, and argues that under *United States v. Garguilo*, 310 F.2d 249 (2d Cir. 1962), the judge's aiding and abetting instruction contained reversible error because it was not sufficiently particularized.

The facts of this case distinguish it from *Garguilo* and indicate that Finkelstein's sufficiency argument is meritless. While it is unclear whether Finkelstein ever received any of the fur coats, the records indicate that it was Finkelstein who first conceived the exchange. He was present at every meeting where the arrangements were negotiated with the furrier, and he initialed the repurchase option which lulled the furrier into believing that the stock was valuable.

*Count 44:*

As to Count 44, appellant Finkelstein was convicted of violating 18 U.S.C. § 1341 with respect to a directed trade of 3500 shares of Pioneer on February 2, 1970. A broker talked with Segal about the trade and conducted it pursuant to Segal's instructions. There is no evidence that Finkelstein participated in the trade or that he mailed the item that was received by the brokerage house and which is listed in Count 44.

■ A conviction of violating the mail fraud statute may not be sustained unless there is sufficient evidence in the record to permit a jury to infer beyond a reasonable doubt that a scheme or artifice to defraud existed, that the participants in the scheme caused the mails to be used in furtherance of that scheme, and that the defendant was a participant

in the fraudulent scheme. *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1179 (2d Cir. 1970); *United States v. Houlihan*, 332 F.2d 8, 13 (2d Cir.), *cert. denied*, 379 U.S. 859, 85 S.Ct. 115, 13 L.Ed.2d 61 (1964).

■ There is ample evidence that Finkelstein participated in the scheme to defraud. A fraudulent scheme most surely was being conducted, and the mail facilities of the United States Post Office were used repeatedly. While Finkelstein may have been on the periphery at the outset, during and after the Reno sit-down he quickly became accustomed to his new-found responsibilities as is evidenced by his fur coat exchange. It is irrelevant that he may not have been a party to the formation of the scheme. *Kaplan v. United States*, 18 F.2d 939 (2d Cir. 1927). Equally irrelevant is the fact that he did not personally mail the count letter or directly involve himself in the transaction underlying Count 44. *Houlihan, supra. United States v. Cohen*, 145 F.2d 82 (2d Cir.), *cert. denied*, 323 U.S. 799, 65 S.Ct. 553, 89 L.Ed. 637 (1945). It is enough that he participated in the scheme and that it was foreseeable that the scheme would involve use of the mails. *Houlihan, supra; Cohen, supra.*[5]

■ In this case, Finkelstein also argues that because he was acquitted of conspiracy, none of the evidence admitted to prove the conspiracy count may be used to find him guilty of Count 44. This conclusion does not follow from the hypothesis. The law is settled that acquittal of one count does not preclude reliance on its evidence for proof of other counts. *United States v. Sisca*, 503 F.2d 1337, 1344, n. 9 (2d Cir.), *cert. denied*, 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974).

## APPELLANT ZUBER'S CHALLENGE TO HIS CONVICTION ON COUNT 29

■ Appellant Zuber argues that there was insufficient evidence to support a finding with respect to Count 29 that he participated in the fraudulent scheme knowing of its means and purposes. This argument is patently frivolous. He played a dominant role in the Reno sit-down, stated to the furrier that "[we] intended [the stock] to go very high" (Tr. 769), and lulled the furrier into the transaction while simultaneously keeping the stock off the market for an additional sixty days by engineering the stock repurchase option.

## EVIDENTIARY OBJECTIONS

*Receipt of a civil injunction:*

■ Appellant Segal argues that it was reversible error for the court to admit into evidence a civil injunction barring him from entering into certain securities transactions in New York.[6] Appellant Scardino argues that its reception also prejudiced him because it led the jury to believe that he was associated with an unsavory character. These arguments are not persuasive. On cross-examination Segal's counsel elicited testimony from Schiffman which left the impression that the only reason that Segal conducted his business through nominees was to avoid creditor levies against assets in accounts under his own name. This opened the door to the admission of the injunction for the purpose of rebutting the false impression which resulted from his cross examination.

Segal also argues that it was improper to introduce the injunction through Schiffman because there was no connecting testimony that he was aware of its existence. This contention is untenable

---

**5.** This *Cohen* case also established that conspiracy to defraud through use of the mails is distinct from the substantive offense of devising a scheme or artifice to defraud. Consequently, it is unnecessary for us to consider the effect of Finkelstein's acquittal of conspiracy upon his conviction in the context of dou-ble jeopardy, *res judicata*, or inconsistent verdicts.

**6.** The permanent injunction was ordered by Hon. Francis X. Conlon, Justice of the Supreme Court of the State of New York, New York County, on October 8, 1959.

because the injunction was entered against him by consent.

Finally, Segal claims that notwithstanding the injunction's reception, the prosecutor injected reversible error into the record by arguing on summation that Segal's violation of the injunction evidenced his guilt of the crimes alleged in the indictment. In disposing of this argument, we need only note that the judge's prompt instructions sufficed to cure the alleged error. (Tr. 1235–36).

*Reception of the hearsay statements by Eddie Levine*

The evidence supporting Segal's conviction on Counts 17, 18, 19 and 23 consists of hearsay declarations by Eddie Levine which were admitted against Segal as declarations of a participating co-conspirator. Eddie Levine [7] was the son of Jack Levine, an associate of Segal and an indicted co-conspirator who was acquitted by the court. Relying on the judgment of acquittal Segal argues that there was insufficient evidence linking Eddie Levine to the conspiracy. Segal notes that Eddie Levine's statement that his father and some others were in on some stock deals and that Pioneer would earn over two dollars per share within a few weeks, being hearsay, is not probative of Eddie Levine's participation. But there was other circumstantial evidence which permitted the inference. Pioneer stock had not been traded for some thirty years. The trading re-opened only after Segal set the conspiracy into motion. This is sufficient to support the inference that Eddie Levine's touting of the stock was connected to the conspiracy and not merely coincidental. Having initiated the conspiracy Segal is responsible for its consequences. *United States v. Cirillo*, 468 F.2d 1233, 1239 (2d Cir.), *cert. denied*, 410 U.S. 989, 93 S.Ct. 1501, 36 L.Ed.2d 188 (1973).

*Reception of Segal's S.E.C. Testimony*

Appellant Scardino argues that the admission of extrajudicial statements of appellant Segal to the S.E.C. was "plain error" because they were post-conspiracy hearsay confessions of a co-defendant who did not take the stand at trial. *See Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). However, to warrant exclusion, the hearsay statements must powerfully incriminate the allegedly prejudiced defendant, *United States v. Wingate*, 520 F.2d 309 at 314–15 (2d Cir. 1975), and this is not the case here. Segal's S.E.C. testimony contains no reference to appellant Scardino. Appellant Scardino offered no objection to the admission of this testimony at trial, nor did he request cautionary instructions. The absence of such instructions was not "plain error".

## PREJUDICIAL SURPLUSAGE IN INDICTMENT

Appellant Zuber contends that the allegation in the indictment that he was unemployed was inflammatory surplusage. While it would have been better if this allegation had been omitted from the indictment, the judge's failure to strike it from the indictment was harmless error. The judge cautioned the jury that an indictment was not evidence, and, in any event, we doubt whether the allegation substantially prejudiced appellant in the eyes of the jurors, some of whom themselves were unemployed.

## RESTRICTION OF CROSS–EXAMINATION

Appellant Zuber contends that the trial judge abused his discretion when he limited the examination of witnesses Acton and Clegg on the issue of their state of mind concerning the conspiratorial agreement with him. We disagree. The judge permitted on re-cross the very question which appellant desired to ask Acton on cross, and Clegg's state of mind was in substance presented to the jury.

Appellant Zuber also contends that the trial judge abused his discretion

7. Eddie Levine died prior to the commencement of the trial.

when he repeatedly sustained objections to appellant's attempts to examine witness Grant concerning the existence of a Government promise not to prosecute Grant in exchange for Grant's testimony. He relies on *Davis v. Alaska*, 415 U.S. 308, 319, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347, 355 (1974), for the proposition that no showing of want of prejudice obviates the error, but that case is distinguishable.

In *Davis*, the witness' probationary status suggested a possibility that he conferred with the police prior to taking the stand. The witness' denial of such conversations appeared to be of questionable truthfulness, and serious damage to the prosecution's case would have been a real possibility if further cross-examination had been permitted. In this case, the Government produced no *Brady* material, and Zuber does not deny that the Government fully discharged its obligations. The extent of cross-examination of a witness is normally resolved by the trial judge in the reasoned exercise of his discretion. We find no abuse of that discretion in this case.

Appellant Segal argues that the trial judge abused his discretion when he prevented counsel from probing the conduct underlying Clegg's prior conviction of thirteen counts of wire fraud after counsel had already elicited the crime, the court, the sentence, and the date of conviction. While there is authority permitting examination into the "nature" of the crime, *United States v. Miller*, 478 F.2d 768, 770 (4th Cir. 1973); *Beaudine v. United States*, 368 F.2d 417, 421 (5th Cir. 1966); the scholarly treatises on which those cases rest indicate that by "nature" is meant only the generic type of criminal behavior and not its particular details. *See McCormick on Evidence* (1972 Ed.) § 43, p. 88, cited in *Miller, supra*. The generic type of criminal behavior having been elicited, the trial judge's restriction of further cross-examination into Clegg's prior criminal convictions was not an abuse of discretion.

## PROSECUTORIAL SUMMATION

Appellant Finkelstein argues that during summation the prosecutor distorted the evidence of appellant's participation in the fur coat exchange. Applying the standard articulated in *United States v. Briggs*, 457 F.2d 908, 911–912 (2d Cir.), *cert. denied*, 409 U.S. 986, 93 S.Ct. 337, 34 L.Ed.2d 251 (1972), we find nothing in the prosecutor's summation constituting plain error.

Appellant Finkelstein also asserted that it was plain error for the trial judge to refuse to reread portions of the testimony to the jury in response to a jury request. However, this inadvertent omission was harmless error, if it was error at all, because the jury request was for testimony unrelated to the February 2, 1970 mailing underlying Count 44, of which appellant was convicted.

The judgments of conviction are affirmed.