**UNITED STATES of America,**
**Appellee–Cross–Appellant,**

v.

**Sanford FREEDMAN, Defendant–**
**Appellant–Cross–Appellee.**

**Nos. 05–2516–cr, 05–6068–cr.**

United States Court of Appeals,
Second Circuit.

March 17, 2008.

Audrey Strauss, Fried, Frank, Harris, Shriver & Jacobson LLP (Andrew T. Gardner, Lisa H. Bebchick, Sloan S. Johnston, on the brief), New York, NY, for Appellant–Cross–Appellee Freedman.

Stanley J. Okula, Jr., Justin S. Weddle, Assistant United States Attorneys (Barbara A. Ward, Celeste L. Koeleveld, on the brief) for Michael J. Garcia, United States Attorney, Southern District of New York, New York, NY, for Appellee–Cross–Appellant United States.

PRESENT: Hon. DENNIS JACOBS, Chief Judge, Hon. AMALYA L. KEARSE, and Hon. ROSEMARY S. POOLER, Circuit Judges.

### SUMMARY ORDER

Sanford Freedman appeals from a judgment of conviction entered by the district court on October 25, 2005. In a separate opinion filed today, we sustain both the government's cross-appeal of Freedman's sentence, *see* 05–6178, and the government's appeal of co-defendant James Cutler's sentence, *see* 05–3303, and vacate for further proceedings. *See United States v. Cutler*, 520 F.3d 136 (2d Cir.2008). We assume the parties' familiarity with the underlying facts, the procedural history, and the issues on appeal.

### I. Sufficiency of the Evidence

In reviewing the sufficiency of the evidence supporting a jury's guilty verdict, we view the evidence in the light most favorable to the government, and construe every permissible inference in the government's favor. *United States v. Lung Fong Chen*, 393 F.3d 139, 150 (2d Cir.2004). The conviction is affirmed if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "We will not overturn a jury verdict merely because an exculpatory account is plausible." *United States v. Downing*, 297 F.3d 52, 56 (2d Cir.2002) (internal quotation and alteration omitted).

Freedman was convicted of one count of conspiring to defraud financial institutions and the Internal Revenues Service, four counts of bank fraud (as to Bank of America, Marine Midland Bank, National Westminster Bank, and Chemical Bank), six counts of making false statements to banks (as to the same four banks), and one count of perjury.

### A. Conspiracy, Bank Fraud & False Statement Counts

■ It is undisputed that there was a conspiracy to defraud banks by convincing them to sell their Tollman–Hundley debt at a steep discount from face value to entities that—unbeknownst to the banks—were controlled by Tollman–Hundley; and Freedman took several actions that helped the conspiracy to succeed. But Freedman claims that there was insufficient evidence to prove beyond a reasonable doubt that he had knowledge of the existence of the conspiracy or knew (1) that Monty Hundley and (allegedly) Stanley Tollman were concealing assets from the banks and (2) that the entities who purchased the debt—chiefly the vehicles named Paternoster and Chelsea—were controlled by Tollman–Hundley. We disagree, and affirm his conviction for conspiracy, bank fraud, and making false statements.

As to Freedman's participation in the scheme as general counsel of the Tollman–Hundley companies, evidence was adduced that: (1) Freedman instructed a Tollman–Hundley employee to process wire transfers that effectuated purchases of Tollman–Hundley debt even though Freedman was aware that the sellers had been told that the purchasers were ostensibly "foreign investors" and not Tollman–Hundley itself; (2) Freedman asked Tollman–Hundley's outside counsel for the use of their escrow accounts, through which funds for some of the debt purchases were routed,

even though most of the purchase agreements did not require use of escrow, a maneuver that (according to the government) was done to conceal the origin of the purchase funds; (3) Freedman directed Tollman–Hundley's outside counsel in all of their legal work for Paternoster and Chelsea; (4) generally, Freedman collaborated with James Cohen, the straw man Tollman–Hundley used as a representative of the fictional "foreign investors," to develop strategies for approaching the banks; (5) specifically, Freedman told Cohen what to offer Bank of America for its Tollman–Hundley debt and told Cohen when his participation was no longer necessary in the Chemical Bank transaction; (6) Freedman received a memo from Howard Zukerman, Vice President of Finance at Tollman–Hundley, that implied that Hundley, Freedman, and Zukerman (and not Cohen) were the individuals structuring the terms of the offers from "foreign investors" to Marine Midland Bank; (7) Freedman finalized the debt purchase agreements by instructing relatives of Stanley Tollman—relatives by marriage who did not share the Tollman name—to sign the agreements on Paternoster's and Chelsea's behalf; (8) an application sent by Freedman to the Mississippi Gaming Commission attached a schedule of assets reflecting that Monty Hundley and Stanley Tollman had valuable stock portfolios, notwithstanding various representations to the banks made and/or facilitated by Freedman to the effect that Hundley and Tollman had no valuable assets upon which they could draw to satisfy their debts; and (9) Freedman was involved in Tollman and Hundley's purchase and sale of the valuable stock to which they were entitled under an "earn-out" stock option agreement with Hospitality Franchise Systems, and Freedman was also involved in delaying one of the bank debt purchases by "foreign investors" such that it immediately followed Tollman and Hundley's receipt of the money from one earn-out installment.

The jury was entitled to rely on this combination of evidence to find that Freedman knew of and agreed to participate in the conspiracy, and the evidence was also sufficient to support Freedman's conviction on the substantive bank fraud counts.

Having found that Freedman had knowledge of the conspiracy, the jury was also entitled to conclude that Freedman knowingly made false statements designed to influence banks when he: (1) participated in finalizing purchase agreements with Chemical Bank, First National Bank of Chicago, and Marine Midland Bank, with each agreement containing the affirmation that Paternoster and/or Chelsea were not owned or controlled by Tollman and Hundley; (2) sent a letter to Bank of America on April 21, 1995, stating that Tollman and Hundley had been working with a European investment group who were interested in purchasing the Bank of America debt; and (3) sent a letter to Bank of America on August 10, 1995, stating that Freedman had "been informed" by James Cohen that Cohen had entered into discussions with Bank of America and declaring that Tollman and Hundley "would [be] willing to consent to" a debt purchase by "clients of Mr. Cohen's firm."

### B. Perjury Count

█ Freedman challenges his perjury conviction on the grounds that the evidence was insufficient to show falsity and that, in any event, the statements were not material to the outcome of the Emeryville bankruptcy proceeding. Because we have already concluded that the evidence is sufficient to support the jury's finding that Freedman knowingly participated in the bank fraud conspiracy, we also conclude

that the jury had sufficient evidence to find that Freedman knew that Tollman–Hundley controlled Paternoster and therefore that Freedman testified falsely when he claimed (1) that the debt owed to Paternoster was an "item of concern" in the Tollman–Hundley offices and (2) that he was unaware of whether Paternoster had made any effort to collect on the debt Tollman–Hundley owed to it.

As to materiality, Freedman points to the fact that at the time he made false statements, Emeryville had received an offer for its assets that eventually resulted in all of its unsecured creditors being paid in full. False testimony is material where it was " 'capable of influencing the fact finder in deciding the issues before [it].' " *United States v. Guariglia,* 962 F.2d 160, 164 (2d Cir.1992) (quoting *United States v. Fayer,* 573 F.2d 741, 745 (2d Cir.1978)). Materiality is ascertained on the basis of the situation at the time the statement was made. *See United States v. McFarland,* 371 F.2d 701, 703–04 (2d Cir.1966). At the time Freedman testified falsely, the offer tendered to Emeryville had not yet been approved by the bankruptcy court; if no sale had ensued, the statements could have influenced the bankruptcy court to overrule objections to Paternoster's participation in any vote on a plan of reorganization; Freedman's statements were therefore material. We affirm the perjury conviction.

## II. Freedman's Request for a Severance

Freedman argues that the district court abused its discretion when it refused to sever his trial from that of Monty Hundley, who submitted an affidavit several weeks before trial, offering to testify on Freedman's behalf if the testimony were taken at a separate trial or after the verdict as to Hundley in a joint trial.

Joint trials are favored where two defendants are indicted together and allegedly participated in a common scheme, *United States v. Salameh,* 152 F.3d 88, 115 (2d Cir.1998) (per curiam); but a trial court has the discretion under Federal Rule of Criminal Procedure 14 to grant a severance or "provide any other relief justice requires" if "the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant." Fed.R.Crim.P. 14. The decision whether to take such action is committed to the sound discretion of the trial court, *United States v. Feyrer,* 333 F.3d 110, 114 (2d Cir.2003), and the denial of a motion to sever cannot be overturned unless it is an abuse of discretion that is so prejudicial as to constitute a "miscarriage of justice." *United States v. Yousef,* 327 F.3d 56, 150 (2d Cir.2003) (internal quotation marks omitted). In deciding whether to grant a severance based on a codefendant's offer to testify at a separate trial, courts weigh the following factors: "(1) the sufficiency of the showing that the codefendant would testify at a severed trial and waive his Fifth Amendment privilege; (2) the degree to which the exculpatory testimony would be cumulative; (3) the counter arguments of judicial economy; and (4) the likelihood that the testimony would be subject to substantial, damaging impeachment." *United States v. Finkelstein,* 526 F.2d 517, 523–24 (2d Cir.1975) (citations omitted), *quoted in United States v. Wilson,* 11 F.3d 346, 354 (2d Cir.1993). We conclude that the district court did not abuse its discretion in weighing these factors.

The district court exercised sound discretion in concluding, as to the first and fourth *Finkelstein* factors, that there was reason to doubt Hundley would make good on his promise to testify and that Hundley would be subject to damaging impeachment.

The district court also exercised sound discretion in concluding that the third factor weighed heavily against severance: the evidence against Hundley and Freedman overlapped considerably; the trial was anticipated to last more than two months, including the testimony of dozens of witnesses; and some witnesses would be traveling from overseas.

Most importantly, the second *Finkelstein* factor weighed against severance: a careful reading of Hundley's affidavit reflects that it did not promise substantially exculpatory testimony. Hundley stated in his affidavit that he would testify that Freedman "had no involvement in any decision" to use Tollman–Hundley funds and entities to purchase bank debt; that Hundley did not personally "inform [Freedman] of any such decision"; that Hundley did not "give ... or grant [Freedman] access" to Hundley's personal financial information; and that to Hundley's knowledge, Freedman had no "direct information" about Hundley's financial situation. Such testimony would not be materially exculpatory because the government's case did not depend upon evidence that Freedman had been explicitly told of the circumstances under which Hundley and Tollman decided to defraud banks or that Freedman had "directly" received information about Hundley's finances: the government's case was based on strong circumstantial evidence that Freedman knew of and entered into the bank fraud conspiracy—however he became aware of it—and actively participated in furthering its goals.

As to Freedman's perjury conviction, Hundley tracked the exact language of Freedman's testimony at the Emeryville proceeding when he indicated he would testify that the Paternoster debt in fact *was* an "item of concern" at Tollman–Hundley's offices. Because the perjury count was based on six statements Freedman made, and Hundley's proposed testimony would only have rebutted two of those six, it was not so exculpatory as to weigh heavily in favor of severance.

In short, because none of the evidence that Hundley proposed to provide would have been very likely to result in Freedman's acquittal, because judicial efficiency weighed in favor of a joint trial and because Hundley was likely either to retract his offer to testify or to be subjected to damaging impeachment if he did testify, the district court's decision not to sever was not an abuse of discretion.

## CONCLUSION

Our companion opinion vacates the sentence of the district court and remands for further proceedings; but for the foregoing reasons, Freedman's conviction is **AFFIRMED.**