**UNITED STATES of America**

**v.**

**STANDARD DRYWALL CORPORATION, Michael Gedell, Arnold Koslow, Frances Katz, Murray Koslow, Joseph Koslow, Harvey Shulman, Barry Shulman, Kevin Ebel, Edward Piccirillo and Arthur Giangrande, Defendants.**

**No. CR–85–00036 (CPS).**

United States District Court,
E.D. New York.

Aug. 28, 1985.

Raymond J. Dearie, U.S. Atty., E.D. of N.Y., Edward A. McDonald, Atty.-in-Charge, Organized Crime Strike Force, Brooklyn, N.Y. (Anthony J. Siano, Sp. Atty., Brooklyn Strike Force, Brooklyn, N.Y., of counsel), for the government.

Hoffman Pollok & Gasthalter, New York City (Jeffrey C. Hoffman, New York City, of counsel), for defendant Standard Drywall Corp.

Gerald L. Shargel, New York City, for defendant Michael Gedell.

Hochheiser & Aronson, New York City (Lawrence Hochheiser, New York City, of counsel), for defendant Arnold Koslow.

LaRossa, Cooper, Axenfeld, Mitchell & Bergman, New York City (John W. Mitchell, New York City, of counsel), for defendant Frances Katz.

Brownstein & Brownstein, New York City (Irwin Brownstein, New York City, of counsel), for defendant Joseph Koslow.

Michael B. Pollack, New York City, for defendant Edward Piccirillo.

Robert M. Simels, New York City, for defendant Arthur Giangrande.

### Opinion and Order

MALETZ, Senior Judge.[1]

Defendants in this criminal action have made a series of pretrial motions. The background is this. On January 14, 1985, a grand jury charged one corporation and ten individuals,[2] in a forty-eight-count indictment, with one violation of the conspiracy statute (18 U.S.C. § 371 (1982)); four sub-

---

1. Of the United States Court of International Trade, sitting by designation.

2. Defendants Murray Koslow, Harvey Shulman, Barry Shulman, and Kevin Ebel have pleaded guilty.

stantive mail frauds (*id.* § 1341); three violations of the Taft-Hartley Act (29 U.S.C. § 186 (1982)); one obstruction of justice (18 U.S.C. § 1503 (1982)); a conspiracy within the meaning of the Racketeer Influenced and Corrupt Organizations Act (RICO) (*id.* § 1962(d)); one substantive violation of the RICO Act (*id.* § 1962(c)); nine counts of filing false corporate payroll tax returns (26 U.S.C. § 7206 (1982)); fourteen counts of attempted evasion of individual income and FICA taxes (*id.* § 7201); and fourteen counts of filing false individual federal income tax returns (*id.* § 7206).

The indictment alleges that defendants Michael Gedell and Arnold Koslow owned and—together with defendants Frances Katz and Joseph Koslow—operated defendant Standard Drywall Corporation (hereafter referred to as Standard Drywall or Standard) as a "double breasted" company. In other words, according to the indictment, Standard had a dual existence during 1979 through 1981, with an apparently legitimate facade masking a totally illicit operation.

More particularly, the indictment alleges, among other things, that Standard violated its contractual obligations to comply with applicable union agreements in performing drywall carpentry and related construction work; that the defendants became involved in mail fraud, federal and state tax fraud, frauds on state worker benefit programs, and corruption of labor officials; that Gedell and Arnold Koslow set up "shell companies," which they operated under pseudonyms; that bank accounts of the shell companies were used to pay workers "off the books"; that, in furtherance of this scheme, Standard made false reports to union benefit funds, state unemployment offices, a disability insurer, and federal and state tax authorities; and that Gedell and the Koslows bribed and threatened union officials, both directly and through defendant Arthur Giangrande.

The defendants have moved jointly for the following relief:

(1) dismissal of the indictment because of the government's delay in returning the indictment;

(2) dismissal of the indictment with respect to Standard and Michael Gedell because of allegedly prejudicial and inappropriate statements made by the prosecutor to the grand jury;

(3) dismissal of count 1 for failure adequately to charge a scheme to defraud the United States;

(4) dismissal of counts 1, 2, 10, and 11 for failure to state a violation of the mail fraud statute;

(5) dismissal of count 1 as multiplicious with count 10;

(6) dismissal of counts 10 and 11 as against Standard on the ground that a corporation cannot be both the "enterprise" and a defendant under RICO, 18 U.S.C. § 1962(c) (1982);

(7) dismissal of paragraphs 1 through 5 of count 11 for failure adequately to allege the extent of the interests that are subject to forfeiture under RICO;

(8) dismissal of counts 1, 2, 3, 10, and 11 on the ground that the mail fraud counts are pyramided upon violations of the Internal Revenue Code;

(9) severance of Arthur Giangrande's trial;

(10) severance of personal tax charges against Frances Katz (counts 21–24) and Edward Piccirillo (counts 43–48);

(11) suppression of statements made by Gedell to FBI Special Agent Stanley Nye;

(12) suppression of all fruits of the search of Standard's offices; and, alternatively

(13) suppression of those books and records seized from Standard's offices that were not described in the search warrant.

In addition, Arthur Giangrande has moved for the following relief:

(14) dismissal of count 1 as duplicitous;

(15) severance of the charges against him on the grounds that joinder was improper and prejudicial; and

(16) a bill of particulars and various discovery.

Finally, Arnold Koslow has moved for: (17) suppression of statements he made to Agent Nye; and

(18) a bill of particulars and various discovery.

The court has conducted an evidentiary hearing on three motions: to dismiss the indictment because of unreasonable delay, to suppress statements by Gedell and Arnold Koslow to government agents, and to suppress materials seized during the search of Standard's offices. Additionally, the court has considered the extensive prehearing and posthearing submissions by the parties.

## I. *Preindictment Delay*

■ Defendants move for dismissal of the indictment on the theory that they were deprived of due process by an unwarranted delay between the alleged offenses and filing of an indictment. The government's investigation of Standard Drywall began in 1979 and the search warrant was executed on May 28, 1981. The grand jury returned an indictment in January 1985. Essentially, the defendants contend that the lateness of the indictment constituted a deprivation of due process because (1) the government has misplaced books and records seized from Standard Drywall's offices, (2) the government obtained information, in the interim, from attorneys representing plaintiffs in civil suits against Standard Drywall, and (3) memories have faded and at least one witness has disappeared.

The Supreme Court has stated that "statutes of limitations, which provide predictable, legislatively enacted limits on prosecutorial delay, provide ' "the primary guarantee against bringing overly stale criminal charges." ' " *United States v. Lovasco,* 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977) (quoting *United States v. Marion,* 404 U.S. 307, 322, 92 S.Ct. 455, 464, 30 L.Ed.2d 468 (1971) (quoting *United States v. Ewell,* 383 U.S. 116, 122, 86 S.Ct. 773, 777, 15 L.Ed.2d 627 (1966))). The Court recognized, however, "that the Due Process Clause has a limited role to play in protecting against oppressive delay." *Id.* The Fifth Amendment "would require dismissal of the indictment if it were shown ... that ... pre-indictment delay ... caused substantial prejudice to [defendants'] rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." *United States v. Marion,* 404 U.S. at 324, 92 S.Ct. at 465 (footnote omitted). "[P]roof of prejudice is generally a necessary but not sufficient element of a due process claim, and ... the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused." *United States v. Lovasco,* 431 U.S. at 790, 97 S.Ct. at 2048. *Accord, e.g., United States v. Birney,* 686 F.2d 102, 105 (2d Cir.1982) (prejudice necessary but not sufficient to claim of preindictment delay); *United States v. Lawson,* 683 F.2d 688, 694 (2d Cir.1982) (defendant must show substantial prejudice and delay engineered by government for improper purpose); *United States v. Elsbery,* 602 F.2d 1054, 1059 (2d Cir.) (defendant must show actual prejudice *and* unjustifiable government conduct), *cert. denied,* 444 U.S. 994, 100 S.Ct. 529, 62 L.Ed.2d 425 (1979).

Defendants face a heavy burden on their motion to dismiss for preindictment delay. *United States v. Elsbery,* 602 F.2d at 1059. "The burden of demonstrating actual prejudice is on defendant, and the proof of prejudice must be definite and not speculative...." *United States v. Birney,* 686 F.2d at 105–06.

Against this background, the court considers the timing of the instant investigation. As of May 28, 1981, all the defendants, except Arthur Giangrande, were aware that the government was investigating Standard Drywall. Giangrande was on notice by August 16, 1982 that he was a target of the grand jury. Nevertheless, prior to December 1983, Standard Drywall made only one request for copies of documents seized during the May 28, 1981 search, and the government complied promptly. In December 1983, Standard Drywall requested copies of all the doc-

uments seized, and the government complied in March 1984. No one examined the original search proceeds on behalf of the defendants until June 1985, when one defendant, one attorney, and a consultant reviewed the proceeds for approximately three hours. Moreover, Arnold Koslow's list, purporting to name all documents missing following the search, was not prepared until June 1985, and was based on his memory, a review of FBI photographs, and consultation with an employee of counsel.

Given all these considerations, the court is hard pressed to believe that the allegedly missing documents carry much importance, let alone pose a threat to defendants' right to a fair trial. Nor was there any impropriety in the government's obtaining information from attorneys for plaintiffs in civil actions brought against Standard Drywall. That several defendants chose to answer interrogatories and deposition questions, rather than exercise their privilege against self-incrimination, was a tactical choice. *Cf. E.F. Hutton & Co. v. Jupiter Development Corp.*, 91 F.R.D. 110, 114 (S.D.N.Y. 1981) (privilege against self-incrimination may be invoked in civil action if reasonable cause to believe direct answer would support conviction or furnish link in chain of evidence to prove crime). Presumably, these defendants wished to avoid the negative inferences that could be drawn in the civil suits from an assertion of Fifth Amendment rights, *see Brinks Inc. v. City of New York*, 717 F.2d 700, 710 (2d Cir. 1983); *Penfield v. Venuti*, 589 F.Supp. 250, 255 (D.Conn.1984), but the dilemma they faced was not the government's fault. Finally, the fading of witnesses' memories and the unavailability of at least one witness are insufficient grounds for a finding of actual prejudice. *See United States v. King*, 560 F.2d 122, 130 (2d Cir.), *cert. denied*, 434 U.S. 925, 98 S.Ct. 404, 54 L.Ed.2d 283 (1977).

Not only have the defendants failed to show actual prejudice, they have also failed to show unjustifiable government conduct. The investigation of the defendants proceeded from May 1981 until the indictment was returned in January 1985, and there is no evidence that the government deliberately delayed the indictment in pursuit of a tactical advantage. Instead, the credible evidence shows that the government's investigation continued during the period leading up to the indictment. For these reasons, the motion to dismiss the indictment on the basis of preindictment delay is denied.

## II. *Grand Jury Prejudice*

■ Defendants Michael Gedell and Standard Drywall seek dismissal of the indictment as against them because of remarks made to the grand jury by the then prosecutor, Special Attorney Laura Brevetti, after Gedell testified on February 1, 1982 as a custodian of records. The relevant portion of the transcript follows:

GRAND JUROR: You were quite specific in keeping to your specific area of questioning which is why I didn't say anything.

I guess it's not important what he does in relation to those corporations?

MS. BREVETTI: Let me explain to you, as a legal advisor, exactly what he is testifying to today.

Mr. Gedell was testifying as an officer or executive or keeper of the records for those corporations to tell us whether or not they exist or are in his possession, control, custody, to comply with the subpoena.

Mr. Shargell [*sic* ] who represents Mr. Gedell informed me that any question outside of that area, Mr. Gedell would invoke his Fifth Amendment privilege.

The law states that as an officer or keeper or custodian of records for a corporation, you have no right to assert your Fifth Amendment privilege with regard to whether or not those documents exist or indeed to produce those records if they exist. There is no Fifth Amendment privilege; it's a personal privilege. It doesn't run to the corporation.

The law is different if it's a partnership or if it's a closely held corporation.

But that's too complex and it doesn't concern us here.

The defendants rely on *United States v. Thibadeau,* 671 F.2d 75 (2d Cir.1982), and section 3.5(b) of the ABA Standards for the Prosecution Function for the proposition that Brevetti's reference to Gedell's Fifth Amendment intentions was improper and prejudicial. Section 3.5(b), as paraphrased in *Thibadeau,* "prohibits a prosecutor from making statements and arguments in order to influence the grand jury 'in a manner which would be impermissible at trial before a petit jury.'" 671 F.2d at 77. Gedell and Standard Drywall further contend that Brevetti's error was compounded by Gedell's assertion of the Fifth Amendment privilege before other sessions of the grand jury.

The Second Circuit has "upheld the dismissal of an indictment only in very limited and extreme circumstances. In such cases, there was a need either to eliminate prejudice to a defendant in a criminal prosecution, where it was impossible to do so by imposition of lesser sanctions, or to deter a pattern of demonstrated and longstanding widespread or continuous official misconduct." *United States v. Broward,* 594 F.2d 345, 351 (2d Cir.), *cert. denied,* 442 U.S. 941, 99 S.Ct. 2882, 61 L.Ed.2d 310 (1979). "[T]he sanction is so drastic that, especially where serious criminal conduct is involved, it must be reserved for the truly extreme cases." *Id. Accord United States v. Bari,* 750 F.2d 1169, 1176 (2d Cir.1984); *United States v. Thibadeau,* 671 F.2d at 77–78. *See also United States v. Rodriguez,* 738 F.2d 13, 16 (1st Cir.1984) (strong showing of actual prejudice required before indictment is dismissed); *United States v. Pino,* 708 F.2d 523, 530 (10th Cir.1983) ("An indictment may be dismissed for prosecutorial misconduct which is flagrant to the point that there is some significant infringement on the grand jury's ability to exercise independent judgment.").

The court cannot agree with defendants' characterization of Brevetti's remarks, which were accurate, though perhaps inap-propriate. It is significant that Gedell had claimed his Fifth Amendment privilege, in the presence of the grand jury, both *before* and after the Brevetti remarks. In these circumstances, the prejudice suffered by Gedell and Standard Drywall is minimal, if existent. Nor can deterrence of official misconduct provide a rationale for dismissal, since there is no evidence of "widespread or continuous official misconduct of the dimensions necessary to warrant imposition of the sanction. . . ." *United States v. Broward,* 594 F.2d at 351. Therefore, the motion by Gedell and Standard Drywall to dismiss the indictment is denied.

### III. *Conspiracy to Defraud the United States*

■ Defendants seek the dismissal of count 1 of the indictment to the extent that it alleges a conspiracy to defraud the United States. Count 1 charged various defendants with, among other things, membership in a conspiracy:

> to defraud the United States by impeding, impairing, obstructing, and defeating the lawful governmental functions of the Internal Revenue Service of the Treasury Department of the United States in the ascertainment, computation, assessment and collection of revenue, to wit: income taxes and FICA taxes. . . .

Defendants argue that count 1 fails to allege any affirmative acts to defraud the Internal Revenue Service inasmuch as it relies solely on off-the-books payments to Standard Drywall employees and failure to maintain records of such payments. They add that "[m]ere failure to disclose income would not be sufficient to show the crime charged of defrauding the United States under 18 U.S.C. § 371," *United States v. Klein,* 247 F.2d 908, 916 (2d Cir.1957), *cert. denied,* 355 U.S. 924, 78 S.Ct. 365, 2 L.Ed.2d 354 (1958), and conclude that count 1 is legally insufficient. *Cf. United States v. Tarnopol,* 561 F.2d 466, 474 (3d Cir.1977) (mere failure to record certain sales on sales journal and accounts receivable ledger insufficient to support conviction for conspiracy to defraud United States by impeding functions of IRS).

But the indictment charges more than a mere failure to disclose income. Count 1 further alleges, *inter alia*, that the defendants aided and abetted evasion of income and FICA taxes by Standard Drywall employees who were paid "off the books" without withholding deductions; that the defendants provided "off the books" employees with false W–2 forms, which were thereafter used by the employees in filing false federal income tax returns; that the defendants filed with the IRS false Employer's Quarterly Federal Tax Returns; and that Standard paid pieceworkers without providing the required Forms 1099 to the workers and Forms 1096 to the IRS.

The Second Circuit has noted that "conspiracy-to-defraud prosecutions are 'scrutinized carefully.'" *United States v. Rosenblatt*, 554 F.2d 36, 40 (2d Cir.1977) (quoting *Dennis v. United States*, 384 U.S. 855, 860, 86 S.Ct. 1840, 1843, 16 L.Ed.2d 973 (1966)). The court, in dismissing the indictment, concluded:

> We hold that when the government proceeds under the conspiracy-to-defraud clause it must plead and prove an agreement with respect to the essential nature of the alleged fraud. Thus, just as the particular offense must be specified under the "offense" branch, [citation omitted], the fraudulent scheme must be alleged and proved under the conspiracy-to-defraud clause.

*Id.* at 42 (footnote omitted).

The vice of the *Rosenblatt* indictment is not present here. The indictment sufficiently pleads a criminal agreement and an intent to defraud the IRS. *See United States v. Ingredient Technology Corp.*, 698 F.2d 88, 98 (2d Cir.), *cert. denied*, 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983). Section 371 "not only includes the cheating of the Government out of property or money, but 'also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest.'" *United States v. Klein*, 247 F.2d at 916 (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 512,

68 L.Ed. 968 (1924)). Such a scheme to obstruct performance by the IRS of lawful governmental functions is pleaded in count 1 of this indictment, and the defendants' motion to dismiss that count is denied.

## IV. *Mail Fraud Counts*

■ Defendants contend that counts 1, 2, 10, and 11 of the indictment must be dismissed because the alleged underreporting of money due the Carpenters' Union benefit funds was at most a contractual violation, but not a crime. The government responds that the mail fraud statute, 18 U.S.C. § 1341 (1982), applies to an employer's scheme to defraud employee benefit funds of workers with whom he has a collective bargaining agreement of contractually mandated benefit contributions.

"The elements of the offense of mail fraud ... are (1) a scheme to defraud, and (2) the mailing of a letter, etc., for the purpose of executing the scheme." *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954). *See United States v. Forzese*, 756 F.2d 217, 220 (1st Cir.1985). *Cf. United States v. Freeman*, 619 F.2d 1112, 1117 (5th Cir.1980) (essential elements are scheme to defraud, which involves use of mails, for purpose of executing scheme), *cert. denied*, 450 U.S. 910, 101 S.Ct. 1348, 67 L.Ed.2d 334 (1981). "Although a mere breach of fiduciary duty, standing alone, may not necessarily constitute a mail fraud, [citations omitted], the concealment by a fiduciary of material information which he is under a duty to disclose to another under circumstances where the non-disclosure could or does result in harm to the other is a violation of the statute." *United States v. Bronston*, 658 F.2d 920, 926 (2d Cir.1981), *cert. denied*, 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982).

■ Thus, the reach of the mail fraud statute is "'seemingly limitless.'" *United States v. Siegel*, 717 F.2d 9, 14 (2d Cir.1983) (quoting *United States v. Von Barta*, 635 F.2d 999, 1001 (2d Cir.1980), *cert. denied*, 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199

(1981)).[3] It is not necessary for the government to prove that the alleged scheme actually deprived any person of money or tangible property, nor must the government show that the defendants benefited from the scheme. *See United States v. Weiss,* 752 F.2d 777, 784 (2d Cir.1985).

It is in this setting that defendants contend, nevertheless, that nondisclosure of union benefits "may have been a breach of contract, an unfair labor practice, and a civil wrong, but it was not a mail fraud violation." Defendants' Prehearing Memorandum of Law at 4. More specifically, defendants argue that the union contract did not rely on defendants' good faith or a fiduciary relationship, but provided for auditing and arbitration procedures, reflecting the adversarial relationship between labor and management. Defendants charge the government with "attempting to bootstrap a violation of a collective bargaining agreement into a mail fraud violation," *id.* at 5, and maintain that the government's approach would render "almost every breach of contract a mail fraud," *id.*

For its part, the government relies heavily on *United States v. S & Vee Cartage Co.,* 704 F.2d 914 (6th Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 343, 78 L.Ed.2d 310 (1983). In *S & Vee,* defendants were convicted of making false statements in documents required to be kept by employee welfare and pension funds, under 18 U.S.C. § 1027 (1982), and of conspiracy and mail fraud. *Id.* at 915. Defendants attempt to distinguish *S & Vee* by arguing that the defendants in that case did not raise, and the Sixth Circuit did not consider, the sufficiency of the allegations of mail fraud. If there is a distinction, it is one without a difference. In *S & Vee,* defendants were accused of falsifying Employee Billing Changes and Corrections (EBCC) forms by understating the number of eligible employees and contributions due a pension fund, *id.* at 915–16, a scheme very similar to the one charged here. Additionally, one

defendant in *S & Vee* did challenge the sufficiency of the evidence to convict him of mail fraud, conspiracy, and a violation of section 1027, and the court found the evidence—all arising out of his involvement with an EBCC form—sufficient to sustain convictions on all counts. *Id.* at 921. Since the court found the evidence sufficient to sustain a mail fraud conviction, *a fortiori,* it found the indictment's allegations of mail fraud sufficient.

This court finds *S & Vee* persuasive. Since the indictment makes out a sufficient allegation of mail fraud, defendants' motion to dismiss counts 1, 2, 10, and 11 is denied, except to the extent that (as discussed in Part VI, *infra* ) counts 10 and 11 charge the corporate defendant, Standard Drywall, with RICO violations.

### V. *Multiplicity*

■ The defendants contend that count 1 of the indictment, charging a conspiracy under 18 U.S.C. § 371, must be dismissed as multiplicious with count 10, which charges a conspiracy to violate the RICO Act. Defendants and the government agree that the test for multiplicity is set forth in *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932), where the Court held that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not." Relying on the statement in *Braverman v. United States,* 317 U.S. 49, 52, 63 S.Ct. 99, 101, 87 L.Ed. 23 (1942), that "a single agreement to commit an offense does not become several conspiracies because it continues over a period of time," defendants argue that proof of count 10 would establish every fact necessary to prove the conspiracy charged in count 1 and that, accordingly, count 1 should be dismissed.

---

**3.** Although *Siegel* dealt with a prosecution under the wire fraud statute, 18 U.S.C. § 1343 (1976), the court observed that "the mail fraud statute ... has been identically construed with respect to the issues before us...." 717 F.2d at 14. *Accord United States v. Ventura,* 724 F.2d 305, 310 (2d Cir.1983).

The government cites a long series of cases to support the proposition that a RICO conspiracy under 18 U.S.C. § 1962(d) contains many elements—such as association with an economic enterprise engaged in or affecting interstate commerce and the presence of a pattern of racketeering—not required by an ordinary conspiracy. Curiously, however, the government does not cite *United States v. Barton*, 647 F.2d 224 (2d Cir.), *cert. denied*, 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981). In the court's view, *Barton*'s clear holding is dispositive:

> Applying the *Blockburger* test, we find that in the RICO provision, 18 U.S.C. § 1962(d), Congress created an offense different from the preexisting general conspiracy statute in 18 U.S.C. § 371, and intended to allow cumulative punishments.

647 F.2d at 236. Accordingly, the court finds that counts 1 and 10 are not multiplicious and denies defendants' motion to dismiss count 1.

## VI. *RICO Enterprises and Defendants*

■ Counts 10 and 11 of the indictment charge Standard and other defendants with participation in a RICO conspiracy and with a substantive violation of the RICO Act. Count 11, alleging the substantive violation, is predicated on 18 U.S.C. § 1962(c), which provides:

> It shall be unlawful for *any person employed by or associated with any enterprise* engaged in, or the activities of which affect, interstate of foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such *enterprise's* affairs through a pattern of racketeering activity or collection of unlawful debt. [Emphasis added.] [4]

The indictment alleges that Standard and the shell companies are the "enterprise" for RICO purposes, yet it also treats Standard as a "person employed by or associated with [the] enterprise." The legal issue

presented—which has given rise to a split among the circuits—is whether the same entity may be both the "person" (i.e., the defendant) and the "enterprise" under section 1962(c). Standard maintains that the same entity may not play both roles and has moved to dismiss counts 10 and 11 of the indictment as against it.

In opposing the motion, the government relies upon the Eleventh Circuit's holding "that a corporation can simultaneously be named as a defendant *and* satisfy the 'enterprise' requirement under RICO." *United States v. Hartley*, 678 F.2d 961, 986 (11th Cir.1982) (emphasis in original), *cert. denied*, 459 U.S. 1183, 103 S.Ct. 834, 74 L.Ed.2d 1027 (1983). The court reasoned that *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), supported a broad reading of "enterprise," 678 F.2d at 988, and "that if an individual were named as the enterprise, and a group of persons engaged in a pattern of racketeering with that individual, it would defy reason to suggest that the central figure (the enterprise) could not also be prosecuted under RICO." *Id.* at 989 (footnote omitted).

The contrary result was reached in *United States v. Computer Sciences Corp.*, 689 F.2d 1181 (4th Cir.1982), *cert. denied*, 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983). The Fourth Circuit held "that 'enterprise' was meant to refer to a being different from, not the same as or part of, the person whose behavior the act was designed to prohibit...." *Id.* at 1190. Unless the statute explicitly authorized simultaneous treatment as enterprise and person—and it did not—the court was unwilling to accept "that a defendant could conspire with his right arm, which held, aimed and fired the fatal weapon." *Id.*

Similarly, in *B.F. Hirsch v. Enright Refining Co.*, 751 F.2d 628 (3d Cir.1984), the Third Circuit noted that most courts of appeals that had considered the issue had held that the enterprise and person may

---

**4.** Count 10, the conspiracy count, alleges a violation of 18 U.S.C. § 1962(d), which provides: "It shall be unlawful for any person to conspire to

violate any of the provisions of subsections (a), (b), or (c) of this section."

not be identical, *id.* at 633, and held "that a violation of section 1962(c) by a corporate entity requires an association with an enterprise that is not the same corporation," *id.* at 634. The court thought it significant that Congress designed section 1962(c) to punish criminals who infiltrated a legitimate corporation rather than the innocent victim of the infiltration. *Id.*

In a like vein, the Ninth Circuit relied on *Computer Sciences* for the proposition that the enterprise and defendant cannot be identical under RICO. *Rae v. Union Bank*, 725 F.2d 478, 481 (9th Cir.1984).[5] The Seventh Circuit also followed *Computer Sciences*, in *Haroco, Inc. v. American National Bank & Trust Co. of Chicago*, 747 F.2d 384, 400 (7th Cir.1984), *aff'd on other grounds*, —— U.S. ——, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985) (per curiam). The court noted a tension between two goals—punishing corporations that are perpetrators but avoiding punishment of corporations that are victims of infiltration. *Id.* at 401. *Haroco* suggested a solution: use of section 1962(a),[6] under which, in contrast to section 1962(c), "a 'person' (such as a corporation-enterprise) acts unlawfully if it receives income derived directly or indirectly from a pattern of racketeering activity in which the person has participated as a principal ..., and if the person uses the income in the establishment or *operation* of an enterprise affecting commerce." *Id.* at 402 (emphasis in original). An action predicated upon section 1962(a) avoids the metaphysical question whether an enterprise can be associated with itself. Significantly, the indictment before this court relies on section 1962(c) and makes no mention of section 1962(a).

The Eighth Circuit addressed the enterprise/person issue in *Bennett v. Berg*, 685 F.2d 1053 (8th Cir.1982), *aff'd en banc*, 710 F.2d 1361, *cert. denied*, —— U.S. ——, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983). The panel that initially heard the appeal affirmed the district court's dismissal of RICO counts that failed to allege an " 'enterprise' ... apart from the 'person' who 'associated with' an enterprise for purposes of racketeering," 685 F.2d at 1061,[7] a conclusion adopted en banc, 710 F.2d at 1363–64.[8]

The Court of Appeals for the Second Circuit has yet to decide the enterprise/person question, but the issue has been discussed in the district courts of this circuit. In *Hudson v. LaRouche*, 579 F.Supp. 623, 624, 628 (S.D.N.Y.1983), and again in *Kaufman v. Chase Manhattan Bank*, 581 F.Supp. 350, 357 (S.D.N.Y.1984), Judge Sweet has followed the *Computer Sciences* line of cases and held that the enterprise and the person may not be identical. Similarly, in *Bulk Oil (Zug) A.G. v. Sun Co.*, 583 F.Supp. 1134, 1144–45 (S.D.N.Y.1983), Judge Stewart determined that the enterprise and the person must be distinct.

---

**5.** The court did not address *United States v. Benny*, 559 F.Supp. 264 (N.D.Cal.1983), which followed *Hartley*, rejected *Computer Sciences*, and held that the enterprise and defendant may be identical. *Benny* was concerned that an individual who qualified as an enterprise not escape RICO prosecution, *id.* at 268, but allowed that:

> The argument against identification of defendant and enterprise might be viable where a *corporate* defendant is involved. In such a situation, the government remains able to prosecute the culpable individuals—agents, officers and employees—associated with the corporate enterprise.

*Id.* (emphasis added).

**6.** Section 1962(a) provides in part:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal ..., to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

**7.** *Bennett* distinguished *Hartley* as "reaching a somewhat different result in unique context in a criminal case." 685 F.2d at 1062.

**8.** One member of the nine-judge en banc panel would follow *Hartley* and hold "that the corporate defendant ... can simultaneously be named as the enterprise through which the defendant or defendants conducted or participated in a pattern of racketeering." 710 F.2d at 1365 (McMillian, J., concurring in part and dissenting in part).

In *Gerace v. Utica Veal Co.*, 580 F.Supp. 1465, 1469 n. 4 (N.D.N.Y.1984), however, Judge Miner rejected defendants' contention that a corporation cannot be sued under RICO and cited *Hartley* for the proposition that, in criminal RICO prosecutions,[9] a corporation may be defendant ("person") and "enterprise" simultaneously. Thus, the conflict among the circuits is duplicated within this circuit.

■ This court is persuaded by the majority view that, in actions brought under section 1962(c), the "person" and the "enterprise" must be distinct. *Hartley*'s broad reading of section 1962(c), while arguably good policy,[10] lacks a firm foundation in the statutory language.

The government, perhaps recognizing that the majority view opposes the *Hartley* approach, has argued in the alternative that Standard may be a RICO defendant because it is not the RICO enterprise. Rather, the argument goes, the enterprise is a group of companies: Standard plus three of its alleged shell companies. The government reads *Computer Sciences* as permitting "the corporation to be a RICO Act defendant so long as the enterprise is different from and not *contained within* the defendant corporation." Government's Prehearing Memorandum of Law at 23 (emphasis in original).

The argument has no merit. The Fourth Circuit actually said the following: "We conclude that 'enterprise' was meant to refer to a being different from, not the same as or part of, the person whose behavior the act was designed to prohibit...." *Computer Sciences*, 689 F.2d at 1190. This does not imply that a corporation that is the major actor in an alleged enterprise may also be a defendant under section 1962(c), merely because the corporation is part of the enterprise rather than the enterprise being part of the corporation.

Moreover, the government's argument is particularly tenuous in light of its contention that the other companies in the alleged enterprise were mere shells or, in the words of the indictment, "non-functioning companies." It is difficult to understand how the "shell companies" could have been inoperative except insofar as necessary to bring Standard within the reach of section 1962(c). Accordingly, counts 10 and 11 of the indictment, insofar as they apply to Standard, are dismissed.

## VII. *RICO Forfeitures*

■ Count 11 of the indictment alleges that defendants Michael Gedell, Arnold Koslow, Frances Katz, and Joseph Koslow acquired and maintained certain interests in violation of RICO and that these "interests" are therefore subject to forfeiture under 18 U.S.C. §§ 1963(a)(1) and (2). The forfeiture allegations are contained in six paragraphs, the last of which, defendants concede, is sufficiently pleaded. Defendants move to dismiss the first five forfeiture paragraphs, however, on the theory that the indictment fails the test of rule 7(c)(2) of the Federal Rules of Criminal Procedure, which provides:

No judgment of forfeiture may be entered in a criminal proceeding unless the indictment or the information shall allege the extent of the interest or property subject to forfeiture.

The five paragraphs in question incorporate prior allegations by reference and list amounts of money alleged to be subject to forfeiture by reason of the conduct alleged in prior counts.[11] According to defendants, this listing is insufficient.

---

**9.** Interpretation of section 1962(c) is assisted by reference to both civil and criminal RICO cases, since the elements of the claim are identical. *See Rich-Taubman Associates v. Stamford Restaurant Operating Co.*, 587 F.Supp. 875, 878 (S.D.N.Y.1984).

**10.** Even the utility of an indictment against Standard is questionable, since the government has been able to prosecute, and has prosecuted, the agents, officers, and employees associated with the corporate enterprise. *See supra* note 5.

**11.** For instance, as to Michael Gedell, the indictment alleges that he acquired and maintained $437,500.00 by reason of his conduct as alleged in count 2 of the indictment, $850,000.00 by reason of his conduct as alleged in count 3, and $31,218.75 by reason of his conduct as alleged in count 4.

A brief review of the policies that underlay the adoption of RICO's forfeiture provisions is helpful.

Congress added the forfeiture provisions to RICO in order to attack the sources of economic power of organized crime in addition to removing from power and imprisoning those individuals who violate the statute. It viewed the sanctions and remedies against organized crime then available to the government as "unnecessarily limited in scope and impact." As enacted the forfeiture provisions are meant to reach "the illgotten gains of criminals where they enter or operate an organization through a pattern of racketeering activity."

*United States v. Cauble,* 706 F.2d 1322, 1345–46 (5th Cir.1983) (footnotes omitted), *cert. denied,* —— U.S. ——, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984). *Cf. Russello v. United States,* 464 U.S. 16, ——, 104 S.Ct. 296, 302, 78 L.Ed.2d 17 (1983) ("[T]he RICO statute was intended to provide new weapons of unprecedented scope for an assault upon organized crime and its economic roots.").

It is in this light that the Second Circuit, in *United States v. Grammatikos,* 633 F.2d 1013, 1024 (2d Cir.1980), held that forfeiture was adequately pleaded in an indictment that stated the government's intent to seek forfeiture of all susceptible profits and property.[12] The court observed that "[t]he plain language of Rule 7(c)(2) requires only that the *extent* of the interest or property subject to forfeiture be alleged," *id.* (emphasis in original), and stated that the rule's "principal objective is to provide persons facing such charges with notice that forfeiture will be sought," *id.* *Grammatikos* found the objective satisfied, since, "though pleaded in barebones statutory language, the indictment advised appellant that the government would seek forfeiture of virtually all of his property." *Id.* *Accord United States v. Raimondo,* 721 F.2d 476, 477 (4th Cir.1983) (indictment need not describe each item subject to for-

feiture), *cert. denied,* —— U.S. ——, 105 S.Ct. 133, 83 L.Ed.2d 74 (1984); *United States v. Cauble,* 706 F.2d at 1347 ("Barebones pleading suffices so long as it puts the defendant on notice that the government seeks forfeiture and identifies the assets subject to forfeiture with sufficient specificity to permit the defendant to marshal evidence in their defense."); *United States v. Boffa,* 688 F.2d 919, 939 (3d Cir. 1982) (allegation that all of defendants' interest in corporations was subject to forfeiture is sufficient), *cert. denied,* 460 U.S. 1022, 1028, 103 S.Ct. 1272, 1280, 75 L.Ed.2d 494, 501 (1983).

Given these considerations, the indictment meets the requirements of rule 7(c)(2), since it identifies the property sought to be seized—money—in specific amounts and ties each sum of money to the crimes alleged in specific counts of the indictment. Because the indictment has put defendants on notice of what the government intends to prove, their motion to dismiss paragraphs 1 through 5 of count 11 is denied.

## VIII. *Mail Fraud Pyramiding*

■ Defendants move for dismissal of the conspiracy, mail fraud, and racketeering charges contained in counts 1, 2, 3, 10, and 11 of the indictment, on the ground that these charges are pyramided on the substantive charges of Internal Revenue Code violations contained in counts 12 through 48. The motion relies upon *United States v. Henderson,* 386 F.Supp. 1048 (S.D.N.Y.1974), where the indictment charged the defendant with tax evasion and mail fraud and the court dismissed the mail fraud counts.

The court in *Henderson* agreed with defendant's contention "that the mail fraud statute was not intended by Congress to apply to a scheme to defraud the United States in an attempt to evade the payment of taxes," *id.* at 1052, and criticized the perceived pyramiding of charges:

The policy of the prosecution of fragmentizing charges which center about

---

**12.** *Grammatikos* was a forfeiture case under the continuing criminal enterprise statute, 21 U.S.C.

§ 848(a)(2) (1982), which, like RICO, is controlled by rule 7(c)(2).

the filing of an alleged false tax return, by applying the mail fraud statute under three separate counts, *two of which include the mailing of the very income tax returns at issue*, with the result that a conviction would permit multiple sentences reaching staggering, if not utterly unrealistic, years of imprisonment, has its outer limits. In my view the outer limits were set by Congress by grouping the various tax violations and delinquencies in the one chapter of the Internal Revenue Code, referred to as the "hierarchical system of sanctions,".…

*Id.* at 1054 (emphasis added) (footnote omitted).

*Henderson* was not appealed, and it has never been explicitly disapproved by the Second Circuit. The Ninth Circuit, however, rejected the holding in *Henderson*, observing that it is inconsistent with cases holding that the mailing of false state—as opposed to federal—tax returns constitutes a violation of the mail fraud statute. *United States v. Miller*, 545 F.2d 1204, 1216 n. 17 (9th Cir.1976), *cert. denied*, 430 U.S. 930, 97 S.Ct. 1549, 51 L.Ed.2d 774 (1977). *See United States v. Weatherspoon*, 581 F.2d 595 (7th Cir.1978); *United States v. LaBar*, 506 F.Supp. 1267, 1274 (M.D.Pa. 1981), *aff'd mem.*, 688 F.2d 826 (3d Cir.), *cert. denied*, 459 U.S. 945, 103 S.Ct. 260, 74 L.Ed.2d 202 (1982). *Cf. United States v. Shermetaro*, 625 F.2d 104, 110–11 (6th Cir. 1980) (distinguishing *Henderson* in conspiracy case and noting that it is not followed in any reported decision).

Although never rejected by the Second Circuit, *Henderson* has not carried the day in that court, either. Thus, in *United States v. Mangan*, 575 F.2d 32, 49 (2d Cir.), *cert. denied*, 439 U.S. 931, 99 S.Ct. 320, 58 L.Ed.2d 324 (1978), the court distinguished *Henderson* on the ground that:

[T]he fraud here did not relate to defendants' own tax liabilities. The scheme here was to swindle the Government by causing it to pay out money to persons having no entitlement to it, in a fashion similar to those embraced within the historic purpose of the mail fraud statute.…

Similarly, in this case the government has alleged that Standard Drywall and its principals made fraudulent mailings that related to the tax liabilities of persons other than themselves, with Standard paying employees in cash and assisting them in evading their taxes so that the corporation might avoid paying union benefits. Moreover, whereas tax-related documents served as the basis of the mail fraud in *Mangan*, the mail fraud, conspiracy, and racketeering alleged in this case involve many mailings unrelated to taxes, such as unemployment documents. Therefore, this is a stronger case than *Mangan* for distinguishing *Henderson*,[13] and the motion to dismiss counts 1, 2, 3, 10, and 11 is denied, except insofar as Standard Drywall's motion to dismiss counts 10 and 11 has been granted.

## IX. *Severance*

■ The defendants, jointly, and Arthur Giangrande, individually, have moved for a severance of Giangrande's trial, pursuant to rule 14 of the Federal Rules of Criminal Procedure. Giangrande has been indicted on three counts: conspiracy, mail fraud, and a Taft-Hartley Act violation. The government has indicated that it will attempt to prove that when John Keane, a Carpenters' Union Business Agent with jurisdiction over a Standard Drywall project on West 62nd Street in Manhattan, tried to enforce a collective bargaining agreement with the company, Gedell and Giangrande tried to buy his silence. The government alleges that Gedell offered cash and that Giangrande—also a Carpenters' Union Business Agent—threatened Keane and then offered him a position on

---

**13.** *See also United States v. DeFiore*, 720 F.2d 757 (2d Cir.1983) (distinguishing *Henderson* in prosecution for wire fraud, 18 U.S.C. § 1343 (1982), where state, rather than federal, tax laws were violated, and noting that *United States v.*

*Miller* rejected *Henderson* where federal tax laws were violated), *cert. denied*, —— U.S. ——, 104 S.Ct. 1684, 80 L.Ed.2d 158, —— U.S. ——, 104 S.Ct. 3511, 82 L.Ed.2d 820 (1984).

Standard's payroll. The government's theory is that the alleged attempt by Giangrande to bribe Keane can be understood only in light of the charged conspiracy to defraud the United States and the Carpenters' Union and the mail fraud on the Union. Moreover, the government argues, Giangrande's motives can be understood only in the perspective of the larger "double breasted" conspiracy.

Giangrande contends that the evidence adduced at the hearing shows no conspiratorial link with the remaining defendants. In addition, he maintains that a joint trial would be unduly prejudicial to him because (1) the vast majority of trial time would be spent on evidence having no bearing on his guilt or innocence, (2) he needs to call either Gedell or Arnold Koslow, or both, to the witness stand, which will be impossible when they refuse to testify at a joint trial, (3) his defense is irreconcilable with those of the other defendants, and (4) he will be subject to prejudicial spillover from the RICO counts in which other defendants are charged.

As to Giangrande's second contention—his need to call exculpatory witnesses—only Koslow has indicated a willingness to testify on Giangrande's behalf; Gedell has made no such representation. Koslow stated in an affidavit that his present intention is not to testify at a joint trial; that, if called by Giangrande at a joint trial, he would assert his constitutional right to remain silent; that he would be willing, however, to testify at Giangrande's trial if a severance is granted and Giangrande is tried after Koslow; and that, under those circumstances, he would testify that he had never met Giangrande before they were both arrested in January 1985, that Koslow had never requested any help from officials of the Carpenters' Union, and that Gedell and Koslow never offered to put Keane, the Union official, on Standard Drywall's payroll.

Giangrande's argument that a joint trial would require the presentation of irreconcilable defenses stems from his intention to prove at trial that he served on a Union trial committee that found co-defendants guilty of violations of Union rules and that the Carpenters' Union ultimately won a judgment of more than $100,000 from Standard Drywall after shutting down its job sites. In a nutshell, Giangrande expects his defense to be that Standard Drywall and its principals were guilty of the improper conduct that led to this indictment and that he, far from condoning or joining in such conduct, took steps to punish it.

Finally, Giangrande disputes the government's estimate that his separate trial would consume approximately eight weeks. For all these reasons, he contends that he is entitled to a severance from his co-defendants.

"Rule 14 accords wide discretion to the district judge in ruling on [severance] motions." *United States v. Sliker,* 751 F.2d 477, 492 (2d Cir.1984). *Accord United States v. Bari,* 750 F.2d 1169, 1177 (2d Cir.1984); *United States v. Potamitis,* 739 F.2d 784, 790 (2d Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 297, 83 L.Ed.2d 232, —— U.S. ——, 105 S.Ct. 332, 83 L.Ed.2d 269 (1984). "A certain amount of prejudice to a defendant is regarded as acceptable given the judicial economies that result from joinder." *United States v. Carpentier,* 689 F.2d 21, 27 (2d Cir.1982) (citing *United States v. Werner,* 620 F.2d 922, 929 (2d Cir.1980)), *cert. denied,* 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 957 (1983). In order to obtain a severance, the defendant must demonstrate "that the prejudice to him from joinder is sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials." *United States v. Panza,* 750 F.2d 1141, 1149 (2d Cir.1984).

### A. Exculpatory Witnesses

The Second Circuit has listed some criteria to be considered when a defendant moves for severance on the basis that co-defendant testimony is required:

> Without purporting to delimit the trial court's field of inquiry, we observe that it properly could have considered: (1) the sufficiency of the showing that the co-de-

fendant would testify at a severed trial and waive his Fifth Amendment privilege ...; (2) the degree to which the exculpatory testimony would be cumulative ...; (3) the counter arguments of judicial economy ...; and (4) the likelihood that the testimony would be subject to substantial, damaging impeachment....

*United States v. Finkelstein,* 526 F.2d 517, 523–24 (2d Cir.1975) (citations omitted), *cert. denied,* 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976).

As to the first *Finkelstein* criterion, it is significant that Koslow's offer to testify is conditioned on Giangrande being tried last, "a condition which smacks of bad faith." *United States v. Bari,* 750 F.2d at 1177 (citing *United States v. Parodi,* 703 F.2d 768, 779–80 (4th Cir.1983)). Since Koslow has pleaded not guilty, it is doubtful, notwithstanding his affidavit, that he would waive the privilege against self-incrimination and testify at Giangrande's trial unless he were first acquitted. *Id. See United States v. Finkelstein,* 526 F.2d at 524.

Nor does Koslow's proffered testimony weigh heavily in favor of severance under the fourth *Finkelstein* criterion, because he surely would be subject to substantial, damaging impeachment. At the very minimum, Koslow admitted, in his testimony at the pretrial hearing, that he had signed false names to checks.

The strongest reason to discount Koslow's proffer is its marginal relevance. The indictment does not charge—and the government does not seek to prove—the contrary of Koslow's proposed testimony. The essence of the charges against Giangrande is that he worked in concert with *Gedell,* and Gedell has not offered to testify on behalf of Giangrande, beyond nebulous representations by counsel. While it is true that Giangrande would be entitled to subpoena Gedell in the event of a severance, Gedell is likely to face the same danger of impeachment as Koslow. Moreover, it is significant that the only affidavit submitted by a potential witness is from Koslow, who cannot negate the accusations

against Giangrande. In the absence of a similar affidavit from Gedell, the court can assume only that Gedell is not prepared to offer exculpatory testimony on behalf of Giangrande, let alone exculpatory testimony that meets the criteria of *Finkelstein.* For all these reasons, the possibility that either Koslow or Gedell will testify for Giangrande is insufficient grounds for a severance.

### B. *Antagonistic Defenses*

Nor is Giangrande on much firmer ground when he points to the purported antagonism between his defense and the defenses of his co-defendants. "A simple showing of some antagonism between defendants' theories of defense does not require severance," *United States v. Carpentier,* 689 F.2d at 27–28, although a severance should be granted when a defendant shows that "the jury, in order to believe the core of testimony offered on behalf of that defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant," *id.* at 28 (quoting *United States v. Berkowitz,* 662 F.2d 1127, 1134 (5th Cir.1981)). *Accord United States v. Papadakis,* 572 F.Supp. 1518, 1521 (S.D.N.Y.1983). *See also United States v. DiGiovanni,* 544 F.2d 642, 644 & n. 2 (2d Cir.1976); *United States v. Johnson,* 478 F.2d 1129, 1131–32 (5th Cir.1973).

Although Giangrande would have the court believe that he intends to put in a defense that accuses his co-defendants of wrongdoing, the only concrete proffer is Giangrande's participation on a Union trial committee that fined Joseph Koslow $900 for violation of union regulations.[14] Such participation may be entirely consistent, however, with membership in the conspiracy, because a $900 fine is hardly significant in comparison with the sums that the defendants stood to gain, if they indeed performed the acts and omissions charged in the indictment.

Giangrande's reference to a $100,000 arbitration judgment won by the Carpenters'

---

**14.** The fine was paid by Arnold Koslow.

Union against Standard Drywall carries little weight, because he does not explain what role, if any, he played in obtaining the judgment. The mere fact that the Union successfully pursued remedies against Standard does not mean that each and every Union official participated in and supported these efforts.

In view of Giangrande's unsatisfactory proffer of testimony from Gedell or Koslow, and the apparent irrelevancy of his proffers regarding the $900 fine and the $100,000 judgment, the court finds that the possibility of antagonistic defenses is, at best, speculative. *See United States v. Aloi,* 449 F.Supp. 698, 740 (E.D.N.Y.1977). Accordingly, the presumption that co-conspirators should be tried together governs, *see, e.g., United States v. Boyd,* 610 F.2d 521, 525 (8th Cir.1979), *cert. denied,* 444 U.S. 1089, 100 S.Ct. 1052, 62 L.Ed.2d 777 (1980); *United States v. Goble,* 512 F.2d 458, 465–66 (6th Cir.), *cert. denied,* 423 U.S. 914, 96 S.Ct. 221, 46 L.Ed.2d 143 (1975), and the motion to sever the trial of Arthur Giangrande is denied.

### X. *Duplicity*

■ Arthur Giangrande moves to dismiss the conspiracy count (count 1) on the ground that it is duplicitous, in that it alleges multiple conspiracies. As Giangrande reads the indictment, it charges one conspiracy to defraud the United States of income and FICA taxes and the State of New York of unemployment insurance benefits, and a second, unrelated conspiracy to protect Standard Drywall from enforcement of a collective bargaining agreement. The government counters that count 1 alleges but a single conspiracy, albeit a conspiracy to violate more than one law.

In *United States v. Murray,* 618 F.2d 892, 896 (2d Cir.1980), the court explained the evils of duplicity:

Important policy considerations underlie the rule that two or more distinct crimes should not be alleged in a single count of an indictment. If an indictment is duplicitous, a general verdict of guilty will not reveal whether the jury found defendant guilty of only one crime and not the other, or guilty of both. [Citation omitted.] Moreover, a guilty verdict on a duplicitous indictment does not indicate whether the jury found defendant guilty without having reached an [*sic* ] unanimous verdict on the commission of a particular offense. Thus, the prohibition of duplicity ·is said to implicate a defendant's rights to notice of the charge against him, to a unanimous verdict, to appropriate sentencing and to protection against double jeopardy in a subsequent prosecution. [Citations omitted.]

But the dangers of duplicity must be viewed in a different light when a conspiracy charge is involved, as the Second Circuit went on to say:

The application of these doctrines to conspiracy indictments poses unique issues, for *a single agreement may encompass multiple illegal objects.* However, it is well established that "[t]he allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for 'The conspiracy is the crime and that is one, however diverse its objects.'" *Braverman v. United States,* 317 U.S. 49, 54, 63 S.Ct. 99, 102, 87 L.Ed. 23 (1942) (quoting *Frohwerk v. United States,* 249 U.S. 204, 210, 39 S.Ct. 249, 252, 63 L.Ed. 561 (1919)).

*Id.* (emphasis added).

The court finds that the conspiracy count of the present indictment, like the conspiracy count in *Murray,* is not duplicitous. "Even if the agreement contemplates more than one nefarious end, there is still but a single agreement." *Id.* at 898. *See United States v. Morrow,* 717 F.2d 800, 804 (3d Cir.1983) (no duplicity in count charging conspiracy to commit mail fraud and to use an explosive to commit mail fraud), *cert. denied,* —— U.S. ——, 104 S.Ct. 975, 79 L.Ed.2d 213 (1984); *United States v. Lyons,* 703 F.2d 815, 821 (5th Cir.1983) (no duplicity in count charging conspiracy to transport and receive stolen property); *United States v. Persico,* 520 F.Supp. 96, 102 (E.D.N.Y.1981) (no duplicity in count charging conspiracy to defraud United States and to commit specified offenses);

*United States v. Sindona,* 473 F.Supp. 764, 766 (S.D.N.Y.1979) (no duplicity in count charging conspiracy to commit a number of criminal acts). Accordingly, Giangrande's motion to dismiss count 1 is denied.

### XI. *Separate Trials on Individual Tax Counts*

 Additionally, the defendants have moved for separate trials on the counts charging Standard Drywall employees with evasion of federal income and FICA taxes. Pointing out that Michael Gedell and Arnold Koslow, corporate officers of Standard Drywall, are not named in counts 21 through 24 and 43 through 48,[15] the defendants argue that these counts were improperly joined to the indictment. *See* Fed. R.Crim.P. 8(a).

The court disagrees. The charges in the individual tax counts arise from a series of transactions connected with the operation of Standard Drywall from 1979 through 1981, and the evasion of taxes by Standard Drywall employees is an element of the conspiracy charged in the indictment. *See, e.g., United States v. Golomb,* 754 F.2d 86, 88 (2d Cir.1985); *United States v. Werner,* 620 F.2d 922, 926 (2d Cir.1980). Thus, joinder was proper under rule 8(a) of the Federal Rules of Criminal Procedure. The court further holds that the minor prejudicial impact of such joinder can be offset by appropriate limiting instructions; therefore, there is no need for separate trials under rule 14. The motion to sever counts 21 through 24 and 43 through 48 is denied.

### XII. *Statements to Agent Nye*

 Defendants Michael Gedell and Arnold Koslow move to suppress certain statements they made to FBI Agent Stanley Nye on May 28, 1981, while Nye and others were executing a search warrant at Standard Drywall's offices. Gedell and Koslow argue that their attorney had instructed Nye not to question them during the search and that Nye's questions were at the behest of the prosecutors and in

violation of DR 7–104(A)(1) of the Model Code of Professional Responsibility.

DR 7–104(A)(1) provides:

> During the course of his representation of a client a lawyer shall not:
>
> > Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.

"DR 7–104(A)(1) may be found to apply in criminal cases, [citations omitted]; and to government attorneys. [Citation omitted.] The rule also may be found to apply to non-attorney government law enforcement officials when they act as the alter ego of government prosecutors." *United States v. Jamil,* 707 F.2d 638, 645 (2d Cir. 1983). Gedell and Koslow contend that Agent Nye, who incidentally is an attorney, acted as the alter ego for the prosecutors in this case and violated DR 7–104(A)(1).

In *United States v. Vasquez,* 675 F.2d 16 (2d Cir.1982), the defendant moved to suppress a tape recording of his conversation with a government informant, which took place after he had testified before a grand jury while represented by counsel and before he was indicted. The court of appeals was unpersuaded by the defendant's argument that his representation by counsel triggered a governmental violation of DR 7–104(A)(1), observing that "[s]uch a principle would simply enable criminal suspects, by retaining counsel, to hamper the government's conduct of legitimate investigations." *Id.* at 17.

In *Jamil,* the Second Circuit specifically found that the defendant had retained counsel at the time the disputed tape recording was made. 707 F.2d at 646. As in *Vasquez,* the defendant had not yet been indicted and the conversation took place in a non-custodial setting. *Id. Cf. United States v. Kenny,* 645 F.2d 1323, 1339 (9th

---

**15.** Defendants' motion was directed at counts 21 through 48, but the court deals only with those counts enumerated in the text, which deal with Frances Katz and Edward Piccirillo. The re-

maining personal tax counts deal with Harvey Shulman, Barry Shulman, Murray Koslow, and Kevin Ebel, all of whom have pleaded guilty.

Cir.) (no violation of disciplinary rule in governmental informant's recording of a preindictment, non-custodial telephone conversation with defendant), *cert. denied*, 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d 425, 454 U.S. 828, 102 S.Ct. 121, 70 L.Ed.2d 104 (1981). *See generally United States v. Dobbs*, 711 F.2d 84, 86 (8th Cir.1983); *United States v. Fitterer*, 710 F.2d 1328, 1333 (8th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 165, 78 L.Ed.2d 150 (1983); *United States v. Lemonakis*, 485 F.2d 941 (D.C. Cir.1973), *cert. denied*, 415 U.S. 989, 94 S.Ct. 1586, 39 L.Ed.2d 885 (1974).

Under these circumstances, the *Jamil* court held that, since the customs agents who were investigating the defendant were not acting as the prosecutor's alter ego, DR 7–104(A)(1) had not been violated. 707 F.2d at 646. The court declined to decide (1) whether the disciplinary rule would have been violated had the investigators been acting as an alter ego or (2) whether suppression would be an appropriate remedy for violation of the rule. *Id.*

This court finds that Agent Nye was not acting as an alter ego of the prosecution.[16] He and his fellow agents were merely executing a valid search warrant—not interrogating the defendants—when Gedell and Koslow, neither of whom was in custody, spoke to them voluntarily in a non-custodial setting, prior to indictment.[17] Nye terminated his interview of Koslow as soon as he requested it to stop and of Gedell as soon as he asked to speak to an attorney. In short, the court finds no violation of DR 7–104(A)(1) or of the Fifth or Sixth Amendment and denies the motion by Gedell and Koslow to suppress their statements at the time of the search.

## XIII. *Search of Standard Drywall's Offices*

 The defendants have moved to suppress all of the fruits of a search conducted by FBI and IRS agents on May 28, 1981 at 2202 Avenue X, Brooklyn, New York, the offices of Standard Drywall. They contend that the agents searched premises and seized documents that were beyond the scope of the search warrant issued on May 22, 1981 by Magistrate John L. Caden. The warrant incorporated by reference descriptions of the premises and of books and records sought to be seized as contained in an affidavit sworn to on May 22 by Special Agent Charles D. Gabriel of the FBI.

### A. *Premises Searched*

The warrant authorized a search of "THE OFFICES OF STANDARD DRYWALL, INC., LOCATED WITHIN THE GROUND FLOOR AND BASEMENT OF A ONE STORY BRICK BUILDING KNOWN AS 2202 AVENUE X, BROOKLYN, NEW YORK, in the EASTERN District of NEW YORK." Defendants contend that the agents exceeded the scope of the warrant when they searched Michael Gedell's office, which, although connected to Standard Drywall's offices at 2202 Avenue X, also opened to the street as 2403 East 22nd Street.

In the application for a search warrant, Agent Gabriel had submitted a map of Standard Drywall's offices that was based on two diagrams that the government had received from a confidential informant. The map was a fair depiction of the premises and included Gedell's office as a portion of the 2202 Avenue X premises. The evidence adduced at the pretrial hearing demonstrated that Gedell was a principal of Standard Drywall and of its shell companies and that the office identified by defendants as Gedell's was also used for Standard Drywall business. Arnold Kos-

---

**16.** The government has submitted to the court proposed findings of fact, Fed.R.Crim.P. 12(e), with regard to certain pretrial motions by the defendants. The court's declination to incorporate in this opinion specific proposed findings should not be taken, standing alone, as a rejection of those alleged facts.

**17.** Although unnecessary to the court's determination of the motion to suppress statements, the court observes that it is hardly clear that the agents asked any questions of Gedell after his attorney requested that he not be questioned. Similarly, it is doubtful whether Koslow was represented by counsel at the time of the search.

low testified that he had regular access to Gedell's office through the hallway door depicted on Gabriel's map. In addition, the side door leading from Gedell's office to 22nd Street had no name on the outside. As of May 28, 1981, the FBI had no reason to doubt that Gedell's office was a portion of Standard Drywall's offices.

In *United States v. McCain*, 677 F.2d 657 (8th Cir.1982), the court held:

> The test for determining the sufficiency of the warrant description is "whether the place to be searched is described with sufficient particularity to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premise might be mistakenly searched."

*Id.* at 660 (quoting *United States v. Gill*, 623 F.2d 540, 543 (8th Cir.), *cert. denied*, 449 U.S. 873, 101 S.Ct. 214, 66 L.Ed.2d 94 (1980)). *Cf. United States v. Avarello*, 592 F.2d 1339, 1344 (5th Cir.) ("Our test in this area is that the search warrant description must be sufficient to enable the executing officer to locate and identify the place to be searched with reasonable effort and without reasonable probability that another premises might mistakenly be searched."), *cert. denied*, 444 U.S. 844, 100 S.Ct. 87, 62 L.Ed.2d 57 (1979).

In *Steele v. United States*, 267 U.S. 498, 45 S.Ct. 414, 69 L.Ed. 757 (1925), in circumstances similar to those confronting the court, the Supreme Court sustained a search conducted under the National Prohibition Act. The prohibition agents obtained a warrant for a garage located at 611 West 46th Street in New York City, including "any building or rooms connected or used in connection with said garage, the basement or sub-cellar beneath the same." *Id.* at 500, 45 S.Ct. at 415. The building had two address: 609 and 611 West 46th Street, *id.* at 502, 45 S.Ct. at 416, with an entrance at 609 used and one at 611 closed, *id.* The Court observed that there was:

> no partition between 611 and 609 on the ground or garage floor, and there were only partial partitions above, and none which prevented access to the elevator on any floor from either the 609 or 611 side. The evidence left no doubt that, though the building had two numbers, the garage business covering the whole first floor and the storage business above were of such a character and so related to the elevator that there was no real division in fact or in use of the building into separate halves.

*Id.* at 502–03, 45 S.Ct. at 416.

Given the essential unity of the premises, the Court held that the warrant was sufficiently descriptive of the premises to be searched:

> The description of the building as a garage and for business purposes as 611 W. Forty-Sixth Street clearly indicated the whole building as the place to be searched. It is enough if the description is such that the officer with a search warrant can with reasonable effort ascertain and identify the place intended.

*Id.* at 503, 45 S.Ct. at 416.

This court finds that *Steele* controls the present facts. The premises at 2202 Avenue X and 2403 East 22nd Street were essentially a single unit, notwithstanding the presence of a door with a lock in between. The offices of Standard Drywall and of Gedell were "for all intents and purposes commingled." *National City Trading Corp. v. United States*, 635 F.2d 1020, 1024 (2d Cir.1980). Accordingly, the warrant authorizing a search of 2202 Avenue X properly encompassed Gedell's office and "particularly describ[ed] the place to be searched" within the meaning of the Fourth Amendment.

### B. *Items Seized*

Defendants also contend that the searching agents exceeded the scope of the warrant in terms of the items they seized. The warrant, insofar as it incorporated paragraph 3 of Agent Gabriel's affidavit, authorized a search for various books and

records pertaining to Standard Drywall [18] and three of its shell companies: "Standard," Standard Baket Corp., and Standard Cevo Corp. Most of the documents seized were self-styled under one of these four names. When the agents conducted the search, however, they also seized various books and records self-styled "Dellmo Contracting," "Irmick Contracting," "Approved Drywall Corp.," "Orbit," "Calderon," [19] "Lamston Contracting," and "Eld Realty." In addition, the agents seized W-2 forms, some of which applied to two defendants.[20]

While defendants argue that these items exceeded the scope of the warrant and must be suppressed, the government responds that they were within the scope of the warrant and, in the alternative, were properly seized under the plain view doctrine. The court need not reach the plain view issue, because it finds that the items in question come within the scope of the search warrant. The first itemized paragraph of the search warrant authorized agents to seize:

> Time sheets, employee records, notes, memoranda and other records, including "combination sheets" and "Combined Master Sheet", setting forth employee and/or subcontractor individual activities, work performance, time and attendance, or labor services rendered and relating to individuals working for or subcontracting from Standard Drywall, Inc. during the period 1979 to the present.

The records of the shell companies fall within the ambit of this paragraph, since the government's theory of the case is that these companies had no independent existence, but were formed solely for the purpose of masking unlawful activities by Standard Drywall and its principals. The labels placed on the files and the corporate names used cannot undo the fact that the files contain records of labor services performed for Standard Drywall by carpenters during the period from 1979 to 1981. Seizure of such records was expressly authorized by the warrant; therefore, the motion to suppress the records of companies other than Standard Drywall, "Standard," Standard Baket, and Standard Cevo is denied.[21]

There is some dispute between the government and the defendants as to which personal tax and insurance records were seized. Defendants allege that the agents seized personal tax records of Michael Gedell and of his parents, Irving and Sylvia Gedell, as well as personal tax and insurance records of Arnold Koslow and Joseph Koslow. Insofar as W-2 forms may have been seized, their seizure was authorized by the search warrant, incorporating paragraph 3(d) of the Gabriel affidavit, and the motion to suppress them is denied. The court has not seen copies of other tax or insurance records allegedly seized and cannot order suppression of these records in a vacuum. Accordingly, the court reserves decision on the admissibility of these other tax or insurance records, if any, until they are offered in evidence, if that time should come.[22]

---

**18.** The affidavit referred to "Standard Drywall Inc." rather than to Standard Drywall Corp.

**19.** Defendants maintain that records entitled "Calden" were also seized, but the court does not believe there is persuasive evidence to support that assertion.

**20.** In making seizures the agents followed procedures discussed prior to the search. All documents taken from Standard Drywall's files by examining agents were shown to Agent Nye, who made the final determination as to what was to be seized. Nye rejected the seizure of certain documents based on his own views or his telephonic consultation with Special Attorney Laura Brevetti of the Organized Crime

Strike Force. The search lasted from approximately 7:30 a.m. to approximately 11:30 a.m., with the inventory of the search including eighty-four items.

**21.** Since the court finds that the places searched and the items seized came within the scope of the warrant, and since the warrant itself did not authorize a general search, the court finds, *ipso facto*, that the search was not a general one.

**22.** The defendants also contend that records titled "Gedell Painting" were seized, but the government has no record of such a seizure. The court reserves decision on the admissibility of these records, for the same reasons that apply to the tax and insurance records.

**1304**

### XIV. *Conclusion*

Standard Drywall's motion to dismiss counts 10 and 11 as against it is granted. Decision is reserved on the discovery motions of Arthur Giangrande and Arnold Koslow. In all other respects, defendants' pretrial motions are denied. Counsel are to appear for a status conference on September 5, 1985, at 2:00 p.m., in Courtroom 6, to discuss scheduling of the trial. *See* 18 U.S.C. § 3161(a) (1982). *See generally United States v. Tunnessen,* 763 F.2d 74 (2d Cir.1985).[23]

SO ORDERED.

---

**23.** At the September 5 status conference, counsel for Giangrande, Arnold Koslow, and the government should be prepared to discuss the status of discovery motions, on which the court has reserved decision. The court has reserved decision inasmuch as counsel for Giangrande led the court to believe that discovery problems had been resolved, *see* Transcript of Pretrial Hearing at 633–40. This impression seems mistaken in view of the references to discovery made in Giangrande's post-hearing briefs. The court likewise is of the impression that the government has complied with Koslow's request for discovery. In any event, whatever discovery problems remain will be resolved at the status conference.